———◆———

Martin J. O'Donnell, Robert A. Cesari, Boston, Mass., for plaintiff.

David Wolf, Wolf, Greenfield & Sachs, Boston, Mass., for defendant.

## OPINION

CAFFREY, Chief Judge.

This is a civil action in which plaintiff charges defendant with patent infringement and with violation of the trademark and copyright laws of the United States. Jurisdiction is invoked on the basis of 28 U.S.C.A. § 1338(a) and (b) and also on the basis of 15 U.S.C.A. § 1121.

Plaintiff, American Precast Corporation (hereinafter American), is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Framingham, Massachusetts. Defendant, Maurice Concrete Products, Inc. (hereinafter Maurice), is a Massachusetts corporation with its principal place of business in Amesbury, Massachusetts. After a nonjury trial I find and rule as follows:

Plaintiff is the owner of United States Patent 3,339,336 (hereinafter the Gogan patent) which was issued to the late Robert M. Gogan and Gilbert T. Jolley by the United States Patent Office on September 5, 1967 for an invention entitled "Structure for Leaching Fields."

Plaintiff is the owner of a trademark, "Ameration," which was registered on the Principal Trademark Register on October 6, 1970 and which has been assigned registration No. 900,008. This trademark is for leaching field chambers.

Defendant has utilized and adopted a trademark, "Permaration," in connection with a leaching field chamber manufactured and marketed by defendant.

Plaintiff is the owner of a copyright registration dated April 13 and May 13,

**AMERICAN PRECAST CORPORATION,**
Plaintiff,

v.

**MAURICE CONCRETE PRODUCTS,**
INC.

Civ. A. No. 70–1706–C.

United States District Court,
D. Massachusetts.

June 14, 1973.

1970 for a pamphlet entitled "Surface Waste Water Disposal." This registration bears the number A148505. No evidence was offered at the trial of any alleged copyright infringement and plaintiff concedes in its post-trial requests for findings of fact and conclusions of law that the cause of action for claimed copyright infringement should be dismissed. Accordingly, no further reference will be made herein to copyright infringement, the claim of which will be dismissed.

The first issue to be resolved is the question of the validity of the Gogan patent. This patent covers a leaching field chamber. A number of the chambers covered by the patent are assembled together to construct a subsurface leaching field which disperses effluent from a septic tank to the tanks in an individual sewage disposal system. The septic tank receives the sewage directly from the house or other building to which it is connected. Most of the solids in the sewage settle out in the tank where some anaerobic decomposition takes place. The tank in turn discharges an effluent in the form of a liquid to the leaching field. This discharge to the leaching field carries with it some particulate material.

A leaching field is intended to perform two functions. First, it is intended to filter the effluent from the septic tank, retaining the solids and dispersing the liquids into the ground. The filtering should take place at the earthen surface. Secondly, the leaching field should provide for continued decomposition of the biological constituents of the effluent.

The biological decomposition is a natural process which can take place in the presence of oxygen, in which case it is referred to as aerobic decomposition, or it can take place in an atmosphere containing little or no oxygen, in which case it is called anaerobic decomposition. Experience over the years has established that in septic tank systems there tends to be a build-up of solids both from the slimes of anaerobic decomposition and also from silt. Over a period of time the build-up of the slime tends to clog and render inoperative a septic tank system.

I find that the traditional system used prior to plaintiff's patent was to discharge sewage through a system which combined a septic tank with a leaching field or less frequently with a tile field using a gravity feed of the sewage from the house unto the disposal system. Leaching fields usually contain several trenches which normally are dug to a width and depth of three feet. These trenches frequently contain a porous granular material which has gravel on the bottom. Pipes containing perforations for the discharge of liquids are then placed in these trenches, and the tranches are backfilled, usually with a layer of gravel over the pipe, and then covered with topsoil of some type. In the operation of such a system the sewage travels from the house to the septic tank and then into the pipes located in the leaching field. The disadvantages to such a system are several. Frequently the granular material which is placed primarily to protect the pipes blocks some of the impervious surface of the infiltration area. Secondly, such leaching field systems are not structurally sound or strong, and the pipes can be broken by the movement of any sort of a heavy vehicle across the leaching field. Lastly, such systems usually produce anaerobic conditions. This in turn results in a build-up of slime along the gravel and eventually the blocking of the holes in the perforated pipes. Such systems are also vulnerable to tree roots which can block pipes and break them.

The entire system as described above is placed subsurface and in effect buried. Consequently, when a breakage occurs, it is difficult to locate and requires substantial digging up, frequently of the entire system, in order to locate and repair the breakage, blockage or other source of trouble in the system.

The Gogan patent (PX 4) discloses a low rectangular structure forming a chamber which has a flat horizontal roof, which structure is completely open on the bottom side. Its sides are comprised of a number of legs or pedestals which support the horizontal roof and which define between them large horizontal passageways extending between the interior and exterior of the chamber. In actual use these chambers are disposed side to side, end to end, on a shallow contiguous excavated earthen surface. These chambers provide a substantial open area above the earthen surface on which the legs or pedestals rest. When a number of discrete units of the structure disclosed by this patent are so disposed or so located the passageways of adjacent chambers are aligned, both laterally and longitudinally, so as to facilitate substantially unimpeded flow of fluid from chamber to chamber over the earthen surface. This surface is characterized in the Gogan patent either as the leaching field "bed" or, alternatively, as the "filtration surface." The presence of air in this area in direct contact with the surface substantially contributes to aerobic decomposition of the waste material. The patent also shows that the chambers have a pair of covered manholes at opposite ends of the horizontal roof, which manholes extend through the roof and thereby allow access to the interior of the chambers. Although not relevant to the validity or infringement of the patent, it should be noted that American is now manufacturing structures with only a single covered manhole. It likewise has changed the sides to shape one of the horizontal passageways so as to accommodate a pallet to aid in the lifting of a chamber by the use of a forklift truck.

It should be noted that defendant's product is also a low rectangular structure with a flat horizontal roof which is completely open at the bottom. Like the plaintiff's product, it also has sides defined by several pedestals which support the roof and which are spaced apart, and thus define large horizontal passageways which extend between the interior and exterior of the chamber. Defendant's product also has a covered manhole to provide access to the interior and, of course, the defendant's accused chambers are intended for use in generally the same manner as those covered by the Gogan patent, i.e., they are butted together, side by side and end to end, in one shallow contiguous excavated area, to enclose that area and to provide a substantial air space above the area so enclosed. When properly assembled defendant's structure allows for the aligning of passageways to facilitate substantially free flow of fluid from one chamber to the other, either laterally or longitudinally.

It should be noted that while there is an air vent (marked 10 on Plaintiff's Ex. 3) which aids in maintaining a quantity of oxygen in the leaching chambers, the presence of a vent through the horizontal roof of the leaching chamber is not a part of the claims of the patent. Such a vent is not essential to the successful operation of the system described by this patent, because the patent is designed to be used in connection with systems which in every instance are connected with a building which contains toilets, lavatories, showers, bathtubs, etc. By law, in Massachusetts and, for that matter, in every other American state, such plumbing must be vented through the roof of the house or other building. A legally required vent of this nature provides a source of oxygen for the system whether or not there is an additional vent of the type shown in Exhibit 3 in the leaching field chamber.

Plaintiff's patent contemplates the use of an excavated area into which is placed a concrete structure made by butting together a number of discrete units, each of which is constructed with an overlapping and an interlocking lip. When butted tightly together, these discrete units provide a watertight seal against surface water passing down from the top. This tight seal likewise prevents earth or other solids from passing through the top of these structures

Assembling and placing together a sufficient number of these units provides a large void space within the totality of all the structures so assembled. This large void space allows for aerobic decomposition. The fact that the chambers are made of precast concrete provides structural integrity for the void area. They are tested for a strength of 20 tons bearing capacity per 54 square inch area. This alignment of a plurality of these discrete units allows waste matter to move either laterally or longitudinally throughout the system so that aerobic conditions for decomposition are maintained at all times. After such a system is installed, it retains enough strength to take heavy wheeled vehicles over the entire area.

The fact that such a system allows for aerobic decomposition substantially eliminates the formation of anaerobic slime building up along the surface. Thus, such a system tends to eliminate the major cause of blocking of most disposal leaching field systems. In short, the use of such a system solves what in the past had been the major problem in the use of any kind of on-site solid waste disposal systems.

In many cases in which there is head-on conflict between the testimony of expert witnesses, a difficult problem is presented in resolving the credibility of the experts and deciding which expert is the reliable and truthful expert. In the instant case I had no difficulty in resolving the conflict in testimony in favor of Professor David H. Marks, Assistant Professor of Civil Engineering at the Massachusetts Institute of Technology. Professor Marks has impressive credentials including a Bachelor's and Master's Degree from Cornell and a Ph. D. in Environmental Engineering from Johns Hopkins. I find that the Gogan patent embodies invention within the meaning of 35 U.S.C.A. § 102 and is a substantial, much-needed step forward in the particular trade. I further find that it was not anticipated by the prior art. I particularly rule that the Fogarty patent upon which defendant places its principal reliance did not anticipate plaintiff's invention. I find that the Fogarty system lacks a provision for a manhole cover for inspection of the leaching area or for rehabilitation of the leaching area, both of which are provided for in plaintiff's system. I find that Fogarty gave no consideration to the merits of aerobic as contrasted with anaerobic decomposition and also that Fogarty gave no consideration to the structural integrity introduced by plaintiff's system as contrasted to the lack of structural integrity produced by a leaching line type structure discussed by Fogarty.

It should be noted that the only patent mentioned in the testimony of witnesses called by the defendant, other than the Fogarty patent, was the Gutman No. 6 patent. I find and rule that Gutman No. 6 does not anticipate plaintiff's devices since it is for a circular structure which moves sewerage in only one direction, i. e., along a longitudinal trench. It also should be noted that Gutman does not provide for inspection or rehabilitation of the system, nor does he discuss or suggest the use of primarily aerobic conditions for decomposition.

In view of the fact that defendant did not undertake to claim that Exhibits 7 through 20 anticipated plaintiff's patent, with the exception of the Fogarty patent which I rule does not do so, no useful purpose is to be served by prolonging this opinion to analyze 13 exhibits not relied on by defendant.

Suffice it to say that a reading of these exhibits does not persuade me that any of them anticipate plaintiff's structure. In ruling that the Gogan patent embodies invention, I also have in mind the file wrapper's contents which included Fogarty; 35 U.S.C.A. § 282; and such decisions as Wilson Research Corp. v. Piolite Plastics Corp., 327 F.2d 139 (1 Cir. 1963); Marston v. J. C. Penney Company, Inc., 353 F.2d 976 (4 Cir. 1965), cert. denied 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437.

While evidence of commercial success of the subject matter of the patent is not controlling on the issue of inventiveness, it is of some significance on that issue and also on the issue of the existence of a need in the industry for the particular device. I accept as factual the testimony of Edward A. Rollins, Vice President of the Ameration Commercial Division of the plaintiff corporation, that the structure covered by the Gogan patent was first placed on the market in October of 1966 and that sales of Ameration chambers grew steadily from 1966 on. He testified that 699 units were sold in 1967, 1877 units were sold in 1968, 3017 units were sold in 1969, 4004 units were sold in 1970, and 5055 units were sold in 1971.

Mr. Rollins also testified that a licensing program was initiated by American in 1968 and that sales reported by licensees were: 288 Ameration chambers in 1968, 1004 units in 1969, 3765 units in 1970, and 4853 units in 1971. The acceptance by the trade of licenses in this volume is not without significance. Columbia Broadcasting System v. Sylvania Electric Products, Inc., 415 F.2d 719 (1 Cir. 1969), cert. denied 396 U.S. 1061, 90 S.Ct. 755, 24 L.Ed.2d 755 (1970). Finally, it should be noted that defendant's product was not brought onto the market until 1970, by which time plaintiff's Ameration chambers, on the basis of the above-quoted statistics, were obviously making a substantial impact in the New England market.

I find and rule that the subject matter of the Gogan patent was not anticipated by the prior art and was not obvious to a person reasonably skilled in that art. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

With regard to the issue of infringement I am persuaded that an examination of Claim 1 of the Gogan patent shows that it clearly reads on the infringing structure manufactured and marketed by the defendant. I find it significant that Lionel Maurice, President, Treasurer and sole owner of all stock in the defendant corporation, admitted that he was aware of the existence of plaintiff's structure and of the trade literature circulated by plaintiff in the marketing of its product for several years before he (Maurice) caused one of his employees to design the offending structure. I do not credit Maurice's testimony in which he tried to put words into the mouth of the now deceased Gogan who cannot be called to rebut Maurice's testimony, and I think it not insignificant that a blank form of lease which Maurice says he received in 1967 or 1968 from the late Robert M. Gogan was undated, as was the handwritten memo which Maurice stapled to the blank form of lease. Maurice made no claim that he fabricated the offending structure until substantially after 1964, and he conceded that he dropped the use of the name Permaration as soon as the instant lawsuit was filed, at which time he changed the trade name of his structure to Permaleach. This course of conduct, I find, is consistent with the recognition by Maurice of the validity of plaintiff's registration of the mark Ameration.

It is significant also that plaintiff's Ameration, which has been on the market since 1965, was studied by Maurice, who admits that his Permaleach unit was designed only three years prior to March 1972. Maurice testified that he designed the Permaleach unit because he began receiving a number of calls from his salesmen in the field who said that there was a need in the trade for a precast structure to be used as a leaching unit. Maurice testified that he received such calls from his salesmen some four to six months before he did the planning for his unit. When pressed by the Court as to exactly when he received such calls from his salesmen he answered "It would be in the same year, I think the whole thing began about three years ago, listening and designing" (i.e., three years before March 8, 1972), which places the calls, the planning and designing several years after the date of

plaintiff's patent application and the issuance thereof, and at some time, difficult to pinpoint on this record, after the successful marketing of plaintiff's product.

Maurice admitted that at the time he designed his Permaleach unit he was aware of the Ameration unit and the Ameration patent. He also admitted that he had seen plaintiff's literature at the time he made his design. I specifically disbelieve Maurice's testimony that in making his design he was not trying to copy plaintiff's structure and I find that he made a Chinese copy of plaintiff's structure, changing it only as to unimportant details with more cosmetic significance than structural or operational significance.

In short, I find that the differences between defendant's structure and plaintiff's are basically nonfunctional differences made solely in an unsuccessful attempt to avoid legal liability for patent infringement and also made to produce a surface difference in appearance between the accused structure and that covered by the patent. Accordingly, I find and rule that defendant's structure infringes the Gogan patent.

■ I also find that on occasion defendant has utilized pictures of plaintiff's product in connection with advertising material emanating from defendant. I find that this conduct amounts to unfair competition. Cf. PX 22 A, 22 B, and DX B.

On the issue of trademark infringement, it should be noted that upon the filing of the instant suit the defendant stopped its use of the name Permaration and substituted therefor Permaleach. I find that this change of name eliminates any present trademark infringement as to the trademark Ameration, but to avoid any additional litigation should defendant undertake to re-adopt the name Permaration the judgment entered herein will permanently enjoin defendant from using the name Permaration during the lifetime of plaintiff's trademark.

If the parties cannot agree on the question of damages after the judgment entered herein on the issues of validity and infringement becomes final, this court will entertain a motion for appointment of a Special Master to determine that issue.