**TRUCK EQUIPMENT SERVICE COMPANY, Appellant-Cross-Appellee,**

v.

**FRUEHAUF CORPORATION, Appellee-Cross-Appellant.**

**Nos. 75–1415 and 75–1428.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1976.

Decided June 9, 1976.

Theodore L. Kessner, Crosby, Guenzel, Davis, Kessner & Kuester, Lincoln, Neb., made argument and filed brief for Truck Equipment.

John A. Blair, Harness, Dickey & Pierce, Birmingham, Mich., made argument and filed brief for Fruehauf Corp.; Edward R. Casselman, Birmingham, Mich., Robert A. Barlow, Barlow, Watson & Johnson, Lincoln, Neb., and Milton J. Mehl, Mehl, Williams, Cummings & Truman, Fort Worth, Tex., on brief.

Before HEANEY, ROSS and WEBSTER, Circuit Judges.

HEANEY, Circuit Judge.

Truck Equipment Service Company (TESCO) is a closely held corporation, headquartered in Lincoln, Nebraska, engaged in the business of servicing and manufacturing semi-trailers. It is the original manufacturer of a twin hopper bottomed grain or bulk commodity semi-trailer featuring a twin hopper design and structure that has been sold in interstate commerce since 1968 under the label "Cornhusker 800." Fruehauf Corporation is a leading manufacturer of semi-trailers headquartered in Detroit, Michigan. It used photographs of the TESCO trailer in its sales literature to promote its entry into the hopper grain trailer market and copied the exterior design of the Cornhusker 800 in the manufacture of its own twin hopper bottomed grain semi-trailer. The District Court held, upon the suit brought by TESCO, that these acts of Fruehauf constituted unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and awarded out-of-pocket expenses exclusive of attorneys fees, taxable costs, nominal compensatory damages, an accounting of profits and an injunction. The injunction was, however, later amended to permit Fruehauf to manufacture and sell twin hopper bottomed grain semi-trailers with an exterior appearance identical to the Cornhusker 800. Both parties appeal. TESCO argues, in substance, that the relief awarded was inadequate.[1] Fruehauf ar-

---

1. TESCO conceded at oral argument, without adopting the reasoning of the District Court, that the issue of whether the injunction should be reinstated is moot. Fruehauf is not currently copying the design of the Cornhusker 800, and there is no reasonable probability that it

gues, in substance, that the District Court erred in finding liability.

## I.

The District Court found that the exterior design of the Cornhusker 800 was unique, that portions of the design were nonfunctional, that the unique design had acquired a secondary meaning in the market place, that the actions of Fruehauf tended to cause confusion over the origin of the trailers and that Fruehauf had copied the exterior design of the Cornhusker 800 in order to trade upon the customer acceptance of the TESCO trailer.[2] Each finding is challenged by Fruehauf. It also makes a broader attack. Namely:

(1) The public interest in having competitive sources of identical utilitarian products makes copying privileged, even though the original incorporates nonfunctional features and has acquired a secondary meaning, when the copier clearly labels its product as its own and is not guilty of palming off; and

(2) Even if the use of the photographs of the Cornhusker 800 constituted a false representation, the use was not violative of § 43(a) of the Lanham Act.

## A.

Fruehauf's contention that it is privileged to copy the exterior design of the Cornhusker 800 is premised on the companion cases of *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day-Brite Lighting,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). It relies particularly upon the following language from *Compco:*

> That an article copied from an unpatented article could be made in some other way, that the design is "nonfunctional" and not essential to the use of either article, that the configuration of the article copied may have a "secondary meaning" which identifies the maker to the trade, or that there may be "confusion" among purchasers as to which article is which or as to who is the maker, may be relevant evidence in applying a State's law requiring such precautions as labeling; however, and regardless of the copier's motives, neither these facts nor any others can furnish a basis for imposing liability for or prohibiting the actual acts of copying and selling. (Citation omitted.)

*Id.* at 238, 84 S.Ct. at 782. Neither case is controlling here.[3]

The language relied upon is *dictum.* The law of trademark and the issues of functionality and secondary meaning were not before the Court. The issue before the Court was whether state law could extend the effective term of patent protection granted by the federal statutes. The focus of the Court was the Supremacy Clause of the Constitution. *See Lear v. Adkins,* 395 U.S. 653, 668, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969); *Boston Pro. Hockey Ass'n v. Dallas Cap & E. Mfg., Inc.,* 510 F.2d 1004, 1013 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); *Field Enterprises Educational Corp. v. Cove Industries, Inc.,* 297 F.Supp. 989, 995–996 (E.D.N.Y.1969).

will do so in the future. Accordingly, our review is limited to the issues of liability and monetary relief.

2. The Fruehauf trailer was not inferior in quality to the Cornhusker 800 and Fruehauf was not guilty of palming off. Each trailer manufactured by Fruehauf was labeled as a product of its Hobbs Division or Fruehauf Division.

3. *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938); *American Rolex Watch Corp. v. Ricoh Time Corp.,* 491 F.2d 877 (2nd Cir. 1974) (per curiam); *Bose Corporation v. Linear Design Labs, Inc.,* 467 F.2d 304 (2nd Cir. 1972); *O'Day Corporation v. Talman Corporation,* 310 F.2d 623 (1st Cir. 1962), *cert. denied,* 372 U.S. 977, 83 S.Ct. 1112, 10 L.Ed.2d 142 (1963); *West Point Manufacturing Co. v. Detroit Stamping Co.,* 222 F.2d 581 (6th Cir.), *cert. denied,* 350 U.S. 840, 76 S.Ct. 80, 100 L.Ed. 749 (1955), and *J. C. Penney Co. v. H. D. Lee Mercantile Co.,* 120 F.2d 949 (8th Cir. 1941), upon which Fruehauf also relies, are equally inapposite. Either the issue presented was limited to the presence of palming off, or the design at issue was found to be functional and without secondary meaning.

The protection accorded by the law of trademark and unfair competition is greater than that accorded by the law of patents because each is directed at a different purpose. The latter protects inventive activity which, after a term of years, is dedicated to the public domain. The former protects commercial activity which, in our society, is essentially private. As stated in *Application of Mogen David Wine Corporation,* 328 F.2d 925, 929 (C.C.P.A.1964):

"[T]he law recognizes that the protection accorded to a design under the patent laws and that accorded to what amounts to a trademark under the common law doctrine of secondary meaning are separate and distinct, and that the rights conferred by law in the one in no way exclude the rights conferred by law in the other."

The underlying purpose and the essence of patent rights are separate and distinct from those appertaining to trademarks. No right accruing from the one is dependent upon or conditioned by any right concomitant to the other. The longevity of the exclusivity of one is limited by law while the other may be extended in perpetuity.

Free competition is served in both cases.[4]

Full and fair competition requires that those who invest time, money and energy into the development of goodwill and a favorable reputation be allowed to reap the advantages of their investment. *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 492, 493, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); 2 Callmann, Unfair Competition, Trademarks and Monopolies § 60.4(b) at 516

(3rd Ed. 1968). As the legislative history of the Lanham Act states:

Trade-marks, indeed, are the essence of competition, because they make possible a choice between competing articles by enabling the buyer to distinguish one from the other. Trade-marks encourage the maintenance of quality by securing to the producer the benefit of the good reputation which excellence creates. To protect trade-marks, therefore, is to protect the public from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.

Senate Report No. 1333, 1946 U.S.Code Cong.Serv., p. 1275.

To protect TESCO against the misappropriation of the exterior design of the Cornhusker 800, portions of which are nonfunctional and which is possessed of a secondary meaning, will be in furtherance of this Congressional purpose.[5] *Potato Chip Institute v. General Mills, Inc.,* 333 F.Supp. 173, 179 (D.Neb.1971), *aff'd per curiam,* 461 F.2d 1088 (8th Cir. 1972); *L'Aiglon Apparel v. Lana Lobell, Inc.,* 214 F.2d 649 (3rd Cir. 1954). Contrary to the situation in *Sears* and *Compco,* there is in the instant controversy no conflict with federal statutory policy.[6] Fruehauf's contention that it is privileged to copy the exterior design of the Cornhusker 800 must fail.

### B.

The contention that the use of photographs of the Cornhusker 800 in Fruehauf's sales literature is not a false repre-

---

**4.** TESCO acknowledges that Fruehauf is free to copy those portions of the exterior design of the Cornhusker 800 that are functional.

**5.** A stated purpose of the Lanham Act is:

Secondly, where the owner of a trademark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

Senate Report No. 1333, 1946 U.S.Code Cong. Serv., p. 1274. *See International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68,

63 L.Ed. 211 (1918); *Mastercrafters C. & R. Co. v. Vacheron & Const.—LE C. W.,* 221 F.2d 464 (2nd Cir.), *cert. denied,* 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955).

**6.** *Sears* and *Compco* recognized that a design protected by trademark cannot be copied. *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day-Brite Lighting,* 376 U.S. 234, 238, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). Trademark mark rights arise, of course, from use and not registration. *Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 926 (8th Cir. 1967).

sentation prohibited by § 43(a) of the Lanham Act must also fail.

Fruehauf argues that its use of photographs of TESCO's product was privileged because its trailer was not inferior in quality to the Cornhusker 800 and because there was no evidence that its trailer was purchased by a consumer under the belief that the trailer was made by TESCO.[7] Fruehauf asserts that this absence of any misrepresentation of quality and palming off is fatal to TESCO's claim because § 43(a) prohibits only false representations by a party respecting its own product. The misrepresentation of the photographs, that Fruehauf made the Cornhusker 800 therein depicted, is not of that nature.

Fruehauf's argument is premised upon a restrictive reading of the applicable law. It relies upon, *inter alia, Bernard Food Industries, Inc. v. Dietene Company,* 415 F.2d 1279 (7th Cir. 1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970), for its proposition but fails to recognize the decision's limitation:

> "But [§ 43(a)] should be construed to include only such false descriptions or representations as are of substantially the same economic nature as those which involve infringement or other improper use of trademarks. It should not be interpreted so as to bring within its scope any kind of undesirable business practice which involves deception, when such practices are outside the field of the trade-mark laws[.]"[8]

*Id.* at 1283, cited from *Samson Crane Co. v. Union National Sales, Inc.,* 87 F.Supp. 218 (D.Mass.1949), *aff'd per curiam,* 180 F.2d 896 (1st Cir. 1950).

■ The deception practices by Fruehauf is of the same economic nature as trademark infringement. As stated by the District Court:

> The unfairness of [Fruehauf's] conduct, however, must be seen as using the photograph of [TESCO's] trailer to trade upon the reputation of [TESCO] and to confuse potential customers as to the source of origin of the trailer pictured on the sales literature.

The use of another's product, misbranded to appear as that of a competitor, has been repeatedly found to be "a false designation of origin" actionable under § 43(a). The fact that the products are of equal quality is not of dispositional significance. *Middletown Manufacturing Co., Inc., v. Super Sagless Corp.,* 382 F.Supp. 979, 982 (N.D.Miss. 1974), *aff'd,* 515 F.2d 509 (5th Cir. 1975); *American Precast Corp. v. Maurice Concrete Prod., Inc.,* 360 F.Supp. 859, 864 (D.Mass.1973), *aff'd,* 502 F.2d 1159 (1st Cir. 1973); *Ideal Toy Corporation v. Fab-Lu, Ltd.,* 261 F.Supp. 238, 242 (S.D.N.Y.1966).

## II.

Having rejected Fruehauf's broadside legal challenge to the judgment and order of the District Court, we turn now to review the assignments of error that are directed at the facts of the instant cause.

The exterior of the Cornhusker 800 is trapazoidal in appearance. The front and rear panels of the trailer slope from the top of each panel outward to the bottom of each panel. This feature has been described throughout the proceedings as the sloping-end walls of the trailer. The lower rail of the side panels presents to the eye a broken line; it is not parallel with and equidistant from the ground level at all points. Rather, it extends above the rear wheels, parallel with the ground, then slopes down and extends for several feet, in

---

7. The Cornhusker 800 photographed by Fruehauf was labeled as a product of its Hobbs Division, the TESCO labels having been removed.

8. Because Fruehauf's use of the photographs of the Cornhusker 800 falls within the limitation to the rule announced in *Bernard Food Industries, Inc. v. Dietene Company,* 415 F.2d 1279

(7th Cir. 1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970), we have no occasion to adopt or reject the Seventh Circuit's decision that:

> False advertising or representations made by a defendant about a plaintiff's product are not covered by section 43(a). (Citations omitted.)

*Id.* at 1283.

a line parallel with the ground, below the top of the rear wheels, then slopes up again at the front landing gears to extend in a line parallel with the ground and on the same plane as the line above the rear wheels. This feature has been described throughout the proceedings as the drop-center-side wall. These features in combination, the sloping-end walls and the drop-center side walls, gave the Cornhusker 800, prior to the copying by Fruehauf, an appearance dissimilar to any other hopper bottomed grain semi-trailer on the market.[9] The side view outline of the trailer looks essentially like this:

A.

◼ The District Court held that the copying of the exterior design of the Cornhusker 800 was unfair competition because portions of the design were nonfunctional, the design had acquired a secondary meaning in the market place, and the actions of Fruehauf tended to confuse the public about the origin of the hopper trailer. *See Bliss v. Gotham Industries, Inc.*, 316 F.2d 848, 855 (9th Cir. 1963); *Federal-Mogul-Bower Bearing, Inc. v. Azoff*, 313 F.2d 405, 409 (6th Cir. 1963). As we said in *J. C. Penney Co. v. H. D. Lee Mercantile Co.*, 120 F.2d 949, 954 (8th Cir. 1941):

[T]he law treats a non-functional aspect of goods as constituting in effect a mere form of merchandising or a business method. The law necessarily and naturally condemns any method of merchandising which unjustifiably tends to deceive or confuse the public. And so, in

competitive goods, the appropriation of a non-functional aspect will generally be regarded as an improper method of merchandising and prohibited as unfair competition, in order to prevent probable deception or confusion of the public in the market.

Fruehauf contends that each finding of the District Court is clearly erroneous.

1. Functionality *Vel Non.*

◼ Our review of the District Court's finding of fact relative to the functionality *vel non* of the sloping-end walls and the drop-center-side walls of the Cornhusker 800 is, of course, guided by the applicable law. It is the rule that:

"Imitation of the physical details and design of a competitor's product may be actionable, if the particular features imitated are 'non-functional' and have acquired a secondary meaning. * * * But, where the features are 'functional' there is normally no right to relief. 'Functional' in this sense might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interests in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the

---

**9.** By stipulation of the parties, the issues of liability and damages were tried separately. Fruehauf argues, on the basis of evidence received after the District Court's order finding liability, that the exterior design of the Cornhusker 800 cannot acquire trademark protection because other trailers have been designed with sloping-end walls and drop-center-side walls. The Cornhusker 800 is, however, aside from Fruehauf's copy, the only hopper bottomed grain trailer which combines these fea-

tures. It is the overall design which the District Court found to be distinctive and possessed of a secondary meaning. *See Application of Minnesota Mining and Manufacturing Co.*, 335 F.2d 836, 837–838, 51 C.C.P.A. 1546 (1964). Discussion of the particular portions of the exterior design is relevant only to the issue of whether they are nonfunctional, thus making the exact copying of the exterior design prohibited.

law grants protection." (Citations omitted.)

*Bliss v. Gotham Industries, Inc., supra* at 855, citing from *Pagliero v. Wallace China Co.,* 198 F.2d 339, 343 (9th Cir. 1952). *Accord, J. C. Penney Co. v. H. D. Lee Mercantile Co., supra.*

■ The line between functionality and nonfunctionality is not, however, brightly drawn in every case. Some designs adopted for the purpose of identification are not wholly useless but perform a utilitarian function. Yet:

> Where a shape or feature of construction is in its concept arbitrary, it may be or become a legally recognizable trademark because there is no public interest to be protected. In such a case protection would not be lost merely because the shape or feature also serves a useful purpose. (Citation omitted.)

*Application of Deister Concentrator Company,* 289 F.2d 496, 506, 48 C.C.P.A. 952 (1961). *See also Application of Minnesota Mining and Manufacturing Co.,* 335 F.2d 836, 840, 51 C.C.P.A. 1546 (1964); *Application of Simmons Company,* 278 F.2d 517, 519, 47 C.C.P.A. 963 (1960). The question in each case is whether protection against imitation will hinder the competitor in competition. *See Application of Hollaender Manufacturing Co.,* 511 F.2d 1186, 1188 (C.C.P.A.1975); *Best Lock Corporation v. Schlage Lock Company,* 413 F.2d 1195, 1199, 56 C.C.P.A. 1472 (1969).

The District Court's finding that the sloping-end walls were nonfunctional was based principally upon the report of Fruehauf engineers which evaluated the construction and design of the Cornhusker 800. The report stated:

> 6. The entire side skin of the rear of the trailer from the transition area back is useless. The way it is set up its only function will be to gather road dirt and mud. Either:

> a. Redesign the aft with an appearance of one of Fruehauf's bulk trailers or

> b. Hinge the rear of the trailer, provide a back door and a floor as an additional selling point to haul limited packaged material instead of dead heading or

> c. Make the empty space a provision for spare tire and tarp storage.

> \*   \*   \*   \*   \*   \*

> 21. See item 6—everything said about the rear is directly applicable to the front.

This clear statement of nonfunctionality was not seriously challenged by Fruehauf at the trial on the issue of liability. *See* note 9 *supra.* Indeed, other evidence was largely consistent with the conclusion of the report.

■ Ernest Churda, the sole stockholder of TESCO and the designer of the Cornhusker 800, testified that the Cornhusker 800 was designed to appear dissimilar from any other hopper bottomed grain trailer on the market. The appearance of the trailer was intended to be its principal selling point. Further, the testimony of Fruehauf's management showed that the decision to manufacture a trailer identical to the Cornhusker 800 was based on sales rather than engineering considerations. Indeed, no effort was made to determine whether the sloping-end walls of the TESCO trailer were functional or nonfunctional before the decision to copy its design was made. In the light of this testimony, we cannot say that the District Court's finding that the sloping-end walls of the Cornhusker 800 are nonfunctional is clearly erroneous. *See Application of Hollaender Manufacturing Co., supra* at 1188; *St. Louis Typographical Union No. 8 v. Herald Company,* 402 F.2d 553, 557 (8th Cir. 1968). The evidence is consistent with the conclusion that the sloping-end walls of the Cornhusker 800, arbitrarily designed for the purpose of identification, were no more than merely incidentally functional. The prohibition against the copying of them will not affect Fruehauf's competitive position in the marketplace.[10]

---

10. Two years after the District Court's decision on liability, the trial on the issue of damages was held. *See* note 9 *supra.* At this second trial, Fruehauf introduced rebuttal testimony, over the objection of TESCO, which contradicted the report of its engineers relied upon by the District Court and the testimony of Churda that the end walls could be constructed differ-

The District Court also found the drop-center-side walls to be nonfunctional. Again, the testimony of Churda was that this design feature of the Cornhusker 800 was the result of his desire to manufacture a trailer of distinctive appearance, and that the same operational advantages could be achieved without the drop-center-side wall feature. No serious rebuttal to this testimony was presented by Fruehauf until the trial on the issue of damages. The District Court's finding that this feature of the Cornhusker 800 is also nonfunctional is not clearly erroneous.[11]

2. Secondary Meaning.

The exterior design of the Cornhusker 800 was found by the District Court to have acquired a secondary meaning because it indicates the origin of the trailer. We have previously stated the necessary elements to establish secondary meaning:

"[A] name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods * * * may become so associated in the public mind with such goods * * * that it serves to identify them and distinguish them from the goods * * * of others. When such an association exists, the name, mark, or symbol is said to have acquired a 'secondary meaning,' in which the original user has a property right which equity will protect against unfair appropriation by a competitor." * * *

"A trade-mark or a trade name may have acquired a secondary meaning in one locality but lack such a meaning in another."

*Shoppers Fair of Arkansas, Inc. v. Sanders Co.,* 328 F.2d 496, 499 (8th Cir. 1964), quoting from *Liberty Mutual Ins. Co. v. Liberty Ins. Co. of Texas,* 185 F.Supp. 895, 903 (E.D.Ark.1960). *See Carter-Wallace, Inc. v. Proctor & Gamble Company,* 434 F.2d 794, 802 (9th Cir. 1970).[12]

---

ently without any effect on efficiency. The testimony was received for the limited purpose of showing Fruehauf's motive as that relates to the propriety of awarding an accounting of profits, *i. e.,* whether Fruehauf acted in good faith. Fruehauf attempts to improperly use this testimony on appeal for a different purpose: to show that the District Court's factual findings on the issue of liability are clearly erroneous.

If this testimony were considered by us on the question of liability, it would show no more than a conflict between the parties on the ability of Fruehauf to manufacture a trailer equivalent in operational efficiency to the Cornhusker 800 with construction methods different from those employed in the manufacture of the TESCO trailer. A conflict, we add, which is mitigated by the failure of Fruehauf witnesses to agree. Specifically, Fruehauf contends that the alternative construction method, a truss-type construction, would add undesirable weight to the trailer making it less salable. Yet, Fruehauf sales personnel testified that the TESCO trailer was too light for its purposes.

11. The comments made in note 10 *supra* are equally applicable here. We note only that at the trial on the issue of damages, Fruehauf witnesses testified to the fact that transverse frame members which support the side walls and carry the hoppers connect in the drop-center area. It was also the testimony below that the functional advantages from this construction could be achieved without exact imitation of the drop-center-side wall design of the Cornhusker 800.

12. Fruehauf relies on *Kellogg Co. v. National Biscuit Co., supra,* and *Skinner Mfg. Co. v. Kellogg Sales Co.,* 143 F.2d 895 (8th Cir.), cert. denied, 323 U.S. 766, 65 S.Ct. 119, 89 L.Ed. 613 (1944), for the proposition that a particular design or form or a particular name is incapable of acquiring a secondary meaning even through long and exclusive use with a single product. Its reliance is misplaced. In *Kellogg,* the Court found that the design or form at issue was functional and, hence, incapable of exclusive appropriation by a single manufacturer. In *Skinner,* the same result was reached because the name at issue was descriptive. The holding of these cases was not that the design or name had not acquired, in fact, associational significance in the marketplace but that the associational significance could not be accorded legal protection. As stated in *Application of Deister Concentrator Company,* 289 F.2d 496, 504, 48 C.C.P.A. 952 (1961):

Again what [Fruehauf] fails to take into account is that as to some words and shapes the courts will never apply the "secondary meaning" doctrine so as to create monopoly rights. The true basis of such holdings is not that they cannot or do not indicate source to the purchasing public but that there is an overriding public policy of preventing their monopolization * * *. * * * Public acceptance of a functional feature as an indication of source is, therefore, not determinative of right to register. Preservation of freedom to copy "functional" features is the determining factor.

■ As previously stated, the exterior appearance of the Cornhusker 800 is, except for the copy of Fruehauf, dissimilar from any other hopper bottomed grain trailer on the market. The trailer was purposely so designed to serve as a badge of identification in the public mind. TESCO, without a sales organization, was dependent for sales upon the good reputation of its product, and the word-of-mouth recommendations of owners and operators. The record below amply supports the District Court's conclusion that there was customer identification. *See Neely v. Boland Manufacturing Co.,* 274 F.2d 195, 201 (8th Cir. 1960). The testimony of Churda, from TESCO, and Jespersen, from Fruehauf, was unequivocal that consumers associated the exterior design of the Cornhusker 800 with a single source, TESCO.[13]

■ Fruehauf argues, however, that consumers could not have associated the exterior design of the Cornhusker 800 as the product of TESCO because, after it entered the market, a similar trailer was made that was clearly labeled as the product of Fruehauf. This argument is a reformulation of the proposition that the law of unfair competition protects only against palming off or misrepresentation. The law of unfair competition, however, protects also against misappropriation. *See International News Service v. Associated Press,* 248 U.S. 215, 242, 39 S.Ct. 68, 63 L.Ed. 211 (1918); note 5 *supra.* As the Supreme Court has said:

> The fault in the reasoning lies in applying as a test the right of the complainant as against the public, instead of considering the rights of complainant and defend-

ant, competitors in business, as between themselves.

*Id.* at 239, 39 S.Ct. at 72.

■ Fruehauf's further argument that secondary meaning could not have attached to the exterior design of the TESCO trailer because the number of trailers sold were relatively few and because advertising was minimal is also unavailing. Clearly, those factors are relevant. *Flavor Corporation of America v. Kemin Industries, Inc.,* 493 F.2d 275, 284 (8th Cir. 1974). But, in the light of the testimony that consumers associated the exterior design of the Cornhusker 800 with TESCO, their importance relates to the extent of the geographical area in which secondary meaning had attached. *See infra.*

3. Likelihood of Confusion.

■ The District Court's finding that the Fruehauf imitation of the Cornhusker 800 caused a likelihood of confusion in the marketplace is also not clearly erroneous. *See Electronic Com'ns, Inc. v. Electronic Components For Ind. Co.,* 443 F.2d 487, 491 (8th Cir.), *cert. denied,* 404 U.S. 833, 92 S.Ct. 80, 30 L.Ed.2d 63 (1971). The testimony below was that consumers were continually asking to determine what, if any, differences distinguished the products of the two companies. Moreover, given the intent of Fruehauf to trade upon the reputation of TESCO, the inference that a likelihood of confusion would arise is inescapable. *See Mastercrafts C. & R. Co. v. Vacheron & Const.—LE C. W.,* 221 F.2d 464, 467 (2nd Cir.), *cert. denied,* 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955); note 13 *supra.*

Fruehauf's reliance upon the fact that its trailer was labeled as its own product and sold through its own channels of distribu-

This public policy against monopolization is absent when, as here, the design sought to be protected is nonfunctional.

13. The District Court relied upon, in addition to the direct testimony, the inference of secondary meaning which arose from the fact that Fruehauf copied the exterior design of the TESCO

trailer exactly without attempting to determine whether any portions thereof were nonfunctional. *See Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.,* 283 F.2d 551, 558 (9th Cir. 1960). The finding that Fruehauf intended to trade upon the customer acceptance of the Cornhusker 800 is not clearly erroneous.

tion is not only misplaced, but also self-defeating. Actual confusion is not the test. Nevertheless, as observed by the Second Circuit, such a marketing practice by a dominant figure in the market tends to promote rather than ensure against confusion. *W. E. Bassett Company v. Revlon, Inc.*, 435 F.2d 656, 662 (2nd Cir. 1970). Indeed, it could be concluded, upon the basis of Churda's testimony, that the acts of Fruehauf caused actual confusion in that rumors were about that Fruehauf had purchased TESCO.

### B.

■ The District Court also held that the use by Fruehauf of photographs of the Cornhusker 800 in its sales literature was unfair competition. Its finding that this constituted a false representation of origin is supported by the record. Similar conduct has been frequently found to be violative of § 43(a) of the Lanham Act.[14] *See* cases cited at 1216, *supra*.

### III.

TESCO was awarded as damages: (1) out-of-pocket expenses exclusive of attorneys fees; (2) taxable costs; (3) nominal compensatory damages resulting from the use by Fruehauf of photographs of the TESCO trailer and the marketing of trailers with the same exterior appearance as the Cornhusker 800; and (4) twenty percent of Fruehauf's profits from sales and trade-ins made in Nebraska, Iowa and Minnesota. Items (1) and (2) are not challenged on appeal. TESCO contends that items (3) and (4) are inadequate. Fruehauf contends that item (4) is excessive.

■ The award of nominal compensatory damages was one dollar. During the period of infringement, prior to June 14, 1973, TESCO sold all of the trailers it could manufacture. The award is challenged because it fails to compensate for lost post-infringement sales. TESCO contends that

but for the infringement, it would have expanded its production facilities during the infringement period and would have been able to sell the additional trailers thus manufactured in the post-infringement period. The District Court found to the contrary. The failure to expand the production facilities was the result of TESCO's decision to expand, instead, its service facilities which were equally as profitable. That finding is not clearly erroneous.

TESCO also challenges the limitations put upon the award of profits. The limitations reflect the District Court's findings that only twenty percent of Fruehauf's profits were attributable to its unlawful use of the distinctive appearance of the Cornhusker 800 and that there was customer identification of the TESCO trailer in only the three states of Nebraska, Iowa and Minnesota. Thus limited, TESCO received $28,370.03. Each limitation is challenged as erroneous. We consider them in reverse order.

■ The scope of protection accorded TESCO against the acts of Fruehauf is limited to the geographical area of actual product market penetration. As said by this Court in *Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 929 (8th Cir. 1967):

> Though the market penetration need not be large to entitle plaintiff to protection * * * it must be significant enough to pose the real likelihood of confusion among the consumers in that area between the products of plaintiff and the products of defendants. (Citations omitted.)

TESCO asserts that it is entitled to protection in a thirteen-state area comprising: Nebraska, South Dakota, North Dakota, Minnesota, Iowa, Illinois, Missouri, Kansas, Oklahoma, Colorado, Wyoming, Texas and Wisconsin.

■ Prior to the entry of Fruehauf into the market, TESCO had sold seventy-two Cornhusker 800's. Nineteen were sold in

---

14. It is argued that because the Hobbs Division and not the Fruehauf Division of Fruehauf used the photographs in its sales literature, the latter division should not be liable therefor. We find it unnecessary to consider the argument because the Fruehauf Division is also liable for marketing trailers with the exterior appearance of the Cornhusker 800.

Nebraska, seventeen in Iowa and fourteen in Minnesota. The remaining twenty-two sales were made in six of the other ten states. No sales were made in Missouri, Oklahoma, Wyoming or Wisconsin. TESCO's advertising during this period was limited to occasional ads in an Omaha, Nebraska, newspaper of general circulation. The record is clear that the sales outside of Nebraska, Iowa and Minnesota were so inconsequential that any market penetration was *de minimus. See id* at 929.

TESCO argues, however, that the importance of the points of purchase is minimized by the fact that the Cornhusker 800 is a mobile product. It is seen and its merits are discussed by owners and operators in whatever state it travels. This word-of-mouth advertising, TESCO contends, operates to expand the area of market penetration.

█ No doubt this form of advertising was important. It may be the cause, at least in part, for the fact that TESCO's volume of sales increased each year. But trademark rights are not acquired by advertising alone; they are acquired by the use of a mark in connection with the sale of the product. *Flavor Corporation of America v. Kemin Industries, Inc., supra* at 284. The District Court correctly, on the basis of the applicable law and the record facts, limited the area of market penetration to the three states of Nebraska, Iowa and Minnesota and did not err in denying profits for sales made outside of those states.

█ The further limitation was imposed to insure that the amount of profits disgorged by Fruehauf was equal to the benefit it received from its unlawful use of the distinctive appearance of the Cornhusker 800. *See Mishawaka R. & W. Mfg. Co. v. S. S. Kresge Co.,* 316 U.S. 203, 206–207, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942). The determination that twenty percent of the profits was attributable to this unlawful use was based upon data derived from a market survey made at the request of Fruehauf.

The District Court concluded therefrom that only that percentage of Fruehauf trailers were purchased for reasons related to the appearance of the TESCO trailer or because of customer knowledge of and comparison with the Cornhusker 800. It proceeded upon the theory that TESCO could be awarded relief from the infringement only to the extent that Fruehauf had been unjustly enriched.

It is unnecessary to review the factual support for this further limitation, for in our view, equity requires that Fruehauf relinquish all of its profits from the sales in the three states wherein TESCO has acquired protectable trademark rights. We proceed upon the theory that such relief is necessary as a deterrence to willful infringement.

A distinguished panel of the Second Circuit [15] had occasion to consider the extent profits should be recovered in a case of this kind in *W. E. Bassett Company v. Revlon, Inc., supra.* There, Revlon unilaterally determined that it could trade upon the goodwill of a competitor by coupling the latter's trademark with its own name and reputation in the manufacture and sale of a cuticle trimmer. Notwithstanding the fact that this infringement did not cause customer confusion, because the competitor was not manufacturing a similar product, and that Revlon's sales were not, therefore, attributable to the unlawful conduct, an accounting of all of Revlon's profits was required because:

> It is essential to deter companies from willfully infringing a competitor's mark, and the only way the courts can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose *all* its profits from its use of the infringing mark. (Citations omitted; emphasis original.)

*Id.* at 664.

While we do not read *Revlon* as authority for the proposition that all of the infringer's profits should be recovered in every

---

**15.** The panel consisted of Associate Justice Clark, Chief Judge Lumbard and Judge Kaufman.

case, we do find that result to be appropriate here.

The District Court found that:

In the present case the evidence shows that [Fruehauf] deliberately copied the distinctive design of [TESCO's] hopper bottomed trailer, and it cannot be said that the defendant believed that no likelihood of confusion as to the source of origin of the trailer would occur in the marketplace. [Fruehauf] chose to copy the most distinctively designed hopper trailer sold in the marketplace in an attempt to divert sales from other competitors who manufactured a less identifiable product. [Fruehauf] deliberately fed upon the identification factors which were intentionally designed into the Cornhusker 800 trailer by [TESCO's] president. Wilfulness and bad faith are clearly shown by the evidence of this case.

This finding is supported by the facts. Fruehauf, without knowledge of or inquiry into the functional and nonfunctional aspects of the exterior design of the Cornhusker 800, copied exactly not only the superior functional qualities of the TESCO trailer but also the exterior physical characteristics by which that good reputation was known to the purchasing public. It not only sought and received the benefits of TESCO's goodwill, but, by coupling the latter's reputation with its own well-known name, set upon a source of conduct which, in practical effect, would destroy the good reputation of TESCO.[16] The award of only twenty percent of Fruehauf's profits is clearly inadequate to ensure that similar conduct will not reoccur in the future.

Moreover, given the bad faith conduct of Fruehauf and the potentially devastating effect that conduct had on its weaker competitor, TESCO, we are hesitant to limit the award on the basis of the fine-tuned results of a post-infringement market survey. The

decision to purchase a product, while usually justified by the objective criteria of performance, is often predetermined by the subjective factor of the product's good reputation previously existent in the marketplace.

Accordingly, the judgment and order of the District Court is affirmed except as to the recovery of profits. As to that, the cause is remanded for entry of judgment in that amount which will award TESCO all of Fruehauf's profits from sales of the trailers copied from the Cornhusker 800 and trade-ins taken as part of the purchase price in the sale of those trailers in Nebraska, Iowa and Minnesota during the period of infringement.

---

16. The District Court found:

Considering the number of Cornhusker 800s which have been manufactured by [TESCO] since [TESCO] began its manufacturing operation up to the present time and the number of copies made and sold by [Fruehauf], it is probable that it no longer can be said that the consuming public identifies the distinctive design of the Cornhusker 800 with [TESCO].