DEERE & COMPANY, Plaintiff,

v.

FARMHAND, INC., Defendant.

Civ. No. 79–503–E.

United States District Court, S.D. Iowa, C.D.

June 30, 1982.

L.R. Voigts, Des Moines, Iowa, Theodore R. Scott, Chicago, Ill., John M. Nolan, Moline, Ill., for plaintiff.

Alan G. Carlson, Minneapolis, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

O'BRIEN, District Judge.

This is an action under Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a) and the common law of unfair competition. Deere & Company (hereinafter referred to as "Deere") sued Farmhand, Inc., on November 2, 1979 to enjoin it from selling two models in its series of "front-end loaders."[1] This action was tried to the Court and the parties have submitted post-trial briefs and proposed findings of fact and conclusions of law. Based on the briefs and argument of counsel and the entire record herein, the Court finds in favor of the defendant on the allegations of the Complaint and in favor of the plaintiff on the antitrust allegations of defendant's counterclaim.

The amended complaint in this matter alleges violations of 15 U.S.C. 1125(a) and the common law of unfair competition. Deere alleges that, through long use and extensive advertising, the color used on its farm machinery and equipment has become known in the industry as "John Deere green." Deere further alleges that the color John Deere green serves the purpose of identifying machinery of that color as the product of Deere & Company. Deere further alleges that its Models 148 and 158 front-end loaders embody distinctive exterior design features that give the loaders a unique configuration or appearance that serves the purpose of identifying loaders of that configuration as products of Deere & Company.

Deere alleges that Farmhand's use of the color John Deere green and embodiment of similar features in its Models F–248 and F–258 loaders, alone or in conjunction with its use of the name "John Deere" in its advertising, constitutes a false description or representation of origin within the meaning of 15 U.S.C. § 1125(a).[2] Deere requests an injunction prohibiting Farmhand from using the color John Deere green on its loaders. It further requests damages in the amount of Farmhand's profits from the sale of its loader Models F–248 and F–258.

Defendant has counterclaimed for declaratory and monetary relief. In Count I of its counterclaim, defendant requests declarations with respect to each element of plaintiff's prima facie case. In Count II of the counterclaim, defendant contends that plaintiff's maintenance of this allegedly baseless action is an attempt to monopolize the market for loaders specially designed for attachment on Deere tractors. Defendant contends that this is a violation of Section 2 of the Sherman Act, 15 U.S.C. 2 and a violation of Section 3 of the Clayton Act, 15 U.S.C. 14. Defendant requests an award of trebled attorneys' fees as damages for these violations. Count III requests a declaration that Section 1 of the Sherman Act and Section 3 of the Clayton Act would be violated if the Court gave protection to the color, John Deere green, under Section 43(a) of the Lanham Act.

## FINDINGS OF FACT

### The Parties and Their Products

Deere is a Delaware corporation having its principal offices and place of business in Moline, Illinois. Deere is currently the United States' leader in the sale of farm machinery and equipment. It is well known nationally for its high quality products. In the industry, it is known as a "full-line" farm machinery manufacturer. A full-line manufacturer makes and sells a complete line of farm equipment, including tractors, attachments and implements. Deere markets its product through an established and sophisticated nationwide dealership network. A John Deere dealer typically handles products of John Deere and other manufacturers.

---

1. A front-end loader is an apparatus attached to a farm tractor and is designed to scoop and move solids. Its primary function in this part of the country is the handling of manure and snow. Plaintiff's Exhibits 100 and 101, show a Deere front-end loader and a Farmland front-end loader attached to Deere's tractors.

2. Deere's original complaint alleged that Farmhand's use of the color John Deere green alone was a violation of the Lanham Act. Deere subsequently amended its complaint to allege the violations noted above.

Farmhand is a Delaware corporation having its principal offices and place of business in Hopkins, Minnesota. Farmhand is a "short-line" manufacturer. A short-line manufacturer is a smaller company that does not manufacture a tractor but manufactures attachments or implements for use in connection with the tractors of full-line companies. Farmhand is well known in its trade area and has a reputation of delivering a high-quality product.

Farmhand's primary product is front-end loaders. It has been making front-end loaders, in one form or another, since 1939. It markets the vast majority of its loaders in North Dakota, South Dakota, Nebraska, Kansas, Colorado, and Idaho. Approximately 98 percent of the Farmhand loaders in question here are sold through John Deere dealers.

For purposes of this litigation, there are two types of front-end loaders, universal-fit loaders and custom-fit loaders. A universal-fit or "will-fit" loader is one that can be mounted on any manufacturer's tractor. A custom-fit loader is specifically designed for a particular manufacturer's tractor. Farmhand made nothing but universal-fit loaders from 1939 until 1977 or 1978, when it introduced its custom-fit loader, Models F–248 and F–258. The Farmhand universal-fit loaders are painted red. Farmhand Models F–248 and F–258 are painted the exact same shade of green as John Deere has used on all of its products since at least as early as 1955. Farmhand continues to sell at least eight models of the red universal-fit loaders.

In 1972, John Deere introduced its loader Models 148 and 158. These custom-fit load-ers were specifically designed for use with John Deere "Generation II" tractors, which were also introduced that year.

John Deere has used the same shade of green as the predominant color upon its entire line of farm machinery and equipment since at least as early as 1955. Deere has sophisticated procedures, tests, and devices for assuring that the color it uses will not vary from factory to factory or from year to year. One such device is a "color-eye" which measures the weathering of paint finishes. Deere requires its paint suppliers to pass rigid paint performance tests and discontinues use of suppliers that do not meet its standards. Deere's advertising[3] prominently and continuously features the shade of green known in the industry as "John Deere green."[4]

William MacGregor of Deere was the project engineer in charge of loaders at all times relevant to these proceedings. He was responsible for the overall design and development of Deere front-end loaders. In connection with this responsibility, Mr. MacGregor consulted with the Henry Dreyfuss Associates, a consulting firm retained by John Deere to assure that its tractors, implements and attachments maintain a continuity or uniformity of style.

*The Appearance of the Deere Models 148 and 158 Loaders*

Deere employees identified several features of its Model 148 and 158 loaders at trial that they believe give these loaders a unique overall configuration or appearance. These features are:

A.  The shape of the loader mast.

B.  The shape of the mounting frame.[5]

3. At trial, there was uncontroverted testimony that Deere has spent in excess of $5 million in each of the past five years on advertising.

4. Farmhand attorneys are quick to point out that the industry means "the shade of green used by John Deere" when it refers to the color "John Deere Green." Other manufacturers have also been associated with their colors in the industry, i.e., Ford blue, International Harvester red, Allis-Chalmers orange. It is obvious that Deere has used more "John Deere green" paint over the years than all other farm equipment manufacturers combined. When

the industry refers to John Deere green, it refers to the shade of green that Deere has used for decades. It is also used by other farm equipment manufacturers. It is called John Deere green because John Deere started it and the overwhelming majority of equipment painted that shade of green bears the John Deere label.

5. The mounting frame attaches directly to the tractor. The loader is then attached to the mounting frame. The purpose of the mounting frame is to distribute the stress of the loader evenly over the body of the tractor. Most of

C. The location of the torque tube.[6]

D. The flat top of the bucket.

E. The location of the lift and bucket cylinders on the knee plate.

F. The routing of the hydraulic lines.

G. The shape and location of decals.

Additionally, Deere employees identified several aspects of the design suggested by Henry Dreyfuss Associates that contribute to the unique overall appearance of the loader. These features are:

A. The elimination of weld-on tabs to mount the cylinders.

B. The use of straight lines to compliment the contour of the Deere Generation II tractors.

C. The use of continuous welds.

D. The bent-over front lip on the top of the loader bucket.

E. Trim and radii details in crucial locations.

Although the foregoing elements of the overall appearance were identified by Deere employees, there was no similar testimony from consumers.

The shape of the loader mast is the result of engineering considerations. In the case of the Deere 148 and 158 loaders, the mast is triangular in shape. The Court is persuaded that the shape of the mast was dictated primarily by a need to distribute stress evenly over the loader frame. Other manufacturers have recognized this and, consequently, use triangular shape masts on their loaders. The Court recalls no evidence that even suggests that Deere incorporated a triangular shaped mast for reasons other than its utilitarian functionality.

The same is true for the mounting frame. The shape of the body of the tractor dictates the shape of the mounting frame to a large extent. The mounting frame distributes stress evenly over the frame of the tractor. Again, the Court recalls no evidence to suggest that the shape of the mounting frame was selected due to any consideration other than its utilitarian functionality.

The torque tube is a device that has been patented by Deere. Farmhand pays Deere a fee to be able to use the torque tube. The location and position of the torque tube was selected by both manufacturers to achieve the optimum utilitarian functionality.[7]

The flat top of the bucket is also functional in that it is parallel to the bottom or "cutting edge" of the bucket and thus, helps the operator to position the loader.

The other details that Deere engineers claim as a part of the unique overall configuration of the loader are all functional with the exception of the location and shape of the decals. The Court notes that there are only a few places on the loader that decals can be placed [8]—on the booms, the knee plates, the mast, the torque tube and the bucket. Deere places its decals on the knee plate and on the mast. Farmhand places decals on the mast, the boom, the knee plates and the torque tube. Both Deere and Farmhand prominently place their decals on their loaders.

The functions performed by the foregoing structural elements could have been performed by structural elements having a substantially different shape or positioned in other locations. This would have made the overall configuration or appearance of the loader substantially different. At trial, there were some suggestions by Deere employees as to alternative structural ele-

the mounting frame is not readily visible. See exhibit 100.

6. The torque tube can be identified on plaintiff's Exhibit 100 as the iron tube that connects the booms of the loader. (Plaintiff's Exhibit 100 is somewhat misleading. The booms are the metal arms that extend from the top of the mast to the bucket. The arrows pointing to the booms on plaintiff's Exhibit 100 actually point to the "knee plates" on the booms.)

7. Deere did not have to license Farmhand to use the torque tube. It seems inconsistent to license the use of the torque tube and then complain that Farmhand violates unfair competition laws when it uses this functional component in the precise manner for which it was designed.

8. See Exhibit 100, to identify the location of technical features described herein.

ments that could have been employed to achieve a different overall appearance for the Farmhand loader. However, the evidence was uncontradicted that these alternatives would have sacrificed function, cost, or appearance considerations.

*Did Farmhand Copy the Deere Loaders?*

There was a considerable amount of evidence at trial relating to the issue of whether Farmhand had "copied" the Deere Models 148 and 158 when it designed the F–248 and F–258 loaders. Specifically, plaintiff points to its Exhibit 1, which is the proposal by Farmhand's general manager, Joseph Lund, for the building of a loader to compete with Deere loaders. In this proposal, Mr. Lund suggests that Farmhand buy Deere loaders and study them to determine if Farmhand can build all of the Deere features and add some of its own to it.

Further evidence that Farmhand had copied portions of the Deere loaders was presented in plaintiff's Exhibit 25, a memorandum from Farmhand's chief engineer, Robert MacGillivray, to its director of operations, John Annin. In this memo, Mr. MacGillivray stated: "Apparently, no design specifications other than 'copy the John Deere 158' were written for this project." The speed with which Farmhand was able to market Mr. Lund's idea is circumstantial evidence suggesting that the F–248 and F–258 loaders were developed with the aid of the Deere models. Farmhand was not able to produce engineering drawings of its loaders drawn prior to the introduction of its loaders on the market.

Despite the testimony of Farmhand employees who claim that the F–248 and F–258 were designed independently from the Deere loaders, the Court is persuaded that Farmhand did copy the Deere loaders.

*Farmers Desire to Match the Color of Their Loaders to Their Tractors*

There was abundant evidence at trial to the effect that farmers desire to "match" their loaders to their tractors. The Court is persuaded that this is, in fact, true. The most convincing evidence in this regard came from the representatives of Deere. Mr. Roy Harrington, Deere's manager of livestock equipment in the Product and Market Planning Department, stated that it was his responsibility [9] to know farmers' needs and desires with respect to loaders. In a memo to John Nolan, a Deere patent attorney, Mr. Harrington stated:

> Farmers leave loaders on their tractors for a significant amount of time and much prefer that they are painted the same color. . . . The ability of Farmhand to sell exactly our color undoubtedly causes us to lose some loader sales.

Fred Sekich,[10] a John Deere dealer in Longmont, Colorado, testified that farmers prefer that their loaders match their tractors, both in their styling and in their color. As a matter of fact, his dealership has had requests to repaint loaders so that they will match the tractor to which they are attached. Most of these requests are to repaint the loaders the color John Deere green.

The other Deere employees who testified at trial also recognized that, generally, farmers are concerned with the aesthetics of their farm machinery and prefer to match their loader to their tractor. The desire to match the loader to the tractor is also shown by Deere's hiring of the Henry Dreyfuss firm to make sure that the loader

---

**9.** Mr. Harrington identified Messrs. Smith, McGregor and Kizlyk as others having responsibility in this area as well. Mr. Harrington has discussed farmers' needs with hundreds of dealers and hundreds of farmers in the past ten years.

**10.** Mr. Sekich's dealership sells the majority of front-end loaders in his area. In addition to being a dealer for eight years, he is also a farmer. He makes monthly visits to other dealers in his territory to acquaint himself with the practices of other dealers. Mr. Sekich, because of his experience, is an expert in the field of loader sales. Mr. Sekich's testimony came in by way of deposition wherein there were numerous leading questions and objections on that basis. This is a trial to the Court, however, and the Court is able to properly weigh his testimony in light of the leading nature of the questions. The objections to his opinion answers are overruled, as are the objections to the form of questions posed to him.

was "styled" to match the tractors on which they are placed.

Deere teaches its dealers that one of the keys to the sale of its loaders is the loader's compatibility with the tractor. Defendant's Exhibits 246 and 254 are salesman training films wherein Deere teaches its salesmen how to sell Deere loaders. The training films are critical of universal-fit loaders in that they are massive and not as compatible with tractors as are custom-fit loaders.

The farmers who testified either specifically stated that they desired their loader to match their tractor or at least recognized the visual impact of color combinations in farm machinery.[11] However, the testimony is also clear that no farmer would purchase a loader solely because of its color.

*The Nature of the Decision to Purchase a Loader*

The purchase of a loader is not an impulse decision. Farmers do extensive research and comparative shopping before purchasing a loader. The most common features examined by farmers when purchasing loaders are lift height, breakout capacity, price, color, ease of attachment, and specialty features such as other available attachments and the availability of a "parking stand."

Deere dealer Fred Sekich described the purchase of a loader as a "planned purchase" taking, on average, between two weeks and ninety days. Farmers are sophisticated buyers who are careful to avoid damaging the $50,000 tractors to which loaders are often attached.

*The Doane Survey* [12]

In preparation for this action, a public opinion survey was conducted for John Deere by the Doane Agricultural Service of St. Louis, Missouri. Doane has been conducting surveys relating to agricultural products since 1955 and has a nationwide "panel" of approximately 15,000 farmers. These persons fill out questionnaires and receive nominal compensation for their participation in surveys.

In the survey conducted by Doane for Deere, two survey mailings were sent out to separate samples of 800 commercial farmers. The first survey questionnaire consisted of two questions accompanied by the cover of a Farmhand advertising brochure, plaintiff's Exhibit 29. The panel members were asked to review the picture for a few moments and then respond to the following questions:

1. Do you think that Farmhand is marketing this loader:
   a. Entirely on its own? or
   b. In conjunction with another company?

2. If you feel they are marketing this loader in conjunction with another company, please specify what company. Why?

Of the 622 farmers responding to this question, 302, or 48.6%, indicated that they thought Farmhand was marketing its loader in conjunction with another company. The other company identified in 277 of these 302 responses was John Deere.

There are several facts that must be viewed contemporaneously with the results of the survey. First, only the cover picture of plaintiff's Exhibit 29 was used. The panel members were thus deprived of any opportunity to read the information presented on the back of the brochure and thereby avoid confusion.

Second, the survey does not assimilate the typical market conditions. Many of the panel members were not financially capable of being probable loader purchasers. The responses were made after only a few mo-

---

11. One farmer, Rudy Kamps, testified that color played no significance in his choice of loader. He described his red loader on his green tractor, however, as looking like a Christmas tree.

12. The Court has considered the results of this survey fully over the strenuous objection of the defendant (*see* p. 98, *infra*). Due to the great emphasis placed on the results of the survey, the Court discusses it at some length. Mr. Roy Cleveland testified on behalf of Deere with respect to the Doane Survey. He is clearly an expert in the subject matter to which he testified. The objections to his opinion testimony are hereby overruled.

ments of reflection on the cover of one loader brochure. The responding panel members were randomly selected from the Doane nationwide panel despite the fact that Farmhand and Deere only compete in the midwest region of the country.

The questions posed in this survey could be interpreted in several ways. Particularly, the phrase, "marketed in conjunction with," is susceptible of several meanings. The Court has no way of knowing how many, if any, of the panel members relied on their knowledge that Farmhand products are sold at Deere dealers. Similarly, it cannot be determined how many of the panel members, if any, may have thought that "marketed in conjunction with" meant the obvious: that these loaders were designed to be sold for use on John Deere tractors. The Court does not know whether this particular phrase was confusing at all. The only point being made is that, maybe, neither does Doane Agricultural Service. The question should have been pre-tested.[13] This defect was aggravated by the inability of Farmhand to test the conclusions by contacting or cross-examining members of the survey panel.

The second phase of the Doane survey measured farmers' association of particular shades of green with agricultural machinery manufacturers. Panel members were given three color tiles and asked to list the machinery manufacturer that they most closely associated with that particular shade. Over 80% of the panel associated the John Deere green tile with Deere & Company.

### The Antitrust Counterclaims

█ The bulk of the testimony on the antitrust counterclaim issues came from Michael Voorhees, John Nolan and Fred Sekich. Mr. Voorhees testified as an expert in the field of unfair competition law. He is a Des Moines attorney and professor of trademark and patent law at Drake University in Des Moines, Iowa. His testimony was offered, over strenuous objection, as evidence of what a reasonably prudent attorney practicing in the field of unfair competition law would have done under the circumstances presented here. This testimony is relevant and the Court hereby overrules the objections thereto.

Mr. Voorhees was asked several questions about opinions generally held by those practicing in the field of unfair competition law. The opinions given were generally "Hornbook law." When asked whether he would have filed this action, Mr. Voorhees' response was inconclusive. He recognized that many factors must be examined before making that determination. It was Mr. Voorhees' testimony that plaintiff would have difficulty proving that the loader features and color were "nonfunctional" as that term is used under § 43 of the Lanham Act (*see* p. 95 *infra*).

John Nolan is the Deere in-house counsel in charge of trademark and unfair competition actions. Mr. Nolan testified at some length about his knowledge of the Lanham Act at the time this action was commenced and the cases on which he relied in believing that John Deere green could receive protection under 15 U.S.C. § 1125(a). He was also examined with respect to Deere's lack of effort to obtain protection for the color John Deere green and its lack of diligence in protesting other uses of the color John Deere green. He testified that he did not discuss the Harrington memo, defendant's Exhibit 175,[14] with anyone after receiving it, but simply put it in his file. Mr. Nolan was also examined at length regarding his reasons for amending the Complaint in this action to include a "configuration of goods" claim in addition to the "color" claim.

Mr. Sekich is a Deere dealer who testified to an event known as an "unsourced order." According to the defendant, Deere requires some of its dealers to sign blank order forms. When a Deere competitor becomes

---

13. The process of pretesting is a survey technique designed to determine whether the panel members understand the question presented to them.

14. Discussed on page 91 to the effect that Deere had information suggesting that farmers much prefer to match their loader with their tractor.

a threat to Deere sales in a particular locality, Farmhand contends that Deere uses the blank order form to overload the dealer with Deere loaders. This would tend to discourage the Deere dealer from purchasing Farmhand loaders. Plaintiff's testimony in this regard was that this was not a practice of Deere, but simply a device used in a couple of instances to accommodate a dealer's demand for speedy product delivery.

Other evidence on this issue consisted of Deere's market share in the loader industry and its stated intention to increase that share. There was also a memo[15] from Barry Smith[16] to John Nolan stating: "We do not seem to have scared Farmhand one little bit!", implying that the purpose of the suit was to scare Farmhand into using other colors on its loader.

The Court has considered this evidence carefully and finds that the defendant has failed to meet its burden of proving that this action was brought in bad faith with an attempt to monopolize the loader market. The strongest evidence in this regard was the unsourced order evidence. However, defendant failed to show that this was a systematic occurrence with the intent to monopolize the loader market. Whereas the Court realizes that the defendant's case must, of necessity, rest on circumstantial evidence, it simply is not satisfied with the weight of the circumstantial evidence presented.

## CONCLUSIONS OF LAW

The Court has jurisdiction over the parties and the subject matter of this litigation. Venue is properly laid in the Southern District of Iowa.

To begin this dissertation on the applicable law, the Court notes that throughout the entire trial of this action, the parties have disagreed as to the nature of the alleged wrong. Although both parties agree that this is an action for unfair competition,[17] they disagree as to the applicability of trademark law. In order to clarify the remainder of this opinion, the Court gives it perception of the nature of this action.

Professor McCarthy explains that trademark infringement is closely related to the law of unfair competition and is, in fact, a species of the generic law of unfair competition. In support of this statement, he cites the following excerpt from S.R. 1333, 79th Cong.2d Sess. (1946), with reports on the bill that ultimately became the Lanham Act:

> There is no essential difference between trademark infringement and what is loosely called unfair competition. Unfair competition is the genus of which trademark infringement is one of the species; .... All trademark cases are cases of unfair competition and involve the same legal wrong.

(*See also, Dallas Cowboy Cheerleaders v. Pussycat Cinema,* 604 F.2d 200 (2d Cir. 1979), wherein the Second Circuit referred to an action under 43(a) of the Lanham Act as one for "trademark infringement.")

The distinguishing factor is that trademark protection and registration law examines whether a particular symbol in fact functions to identify and distinguish the goods or services of one seller. The law of unfair competition asks the same question with reference to a larger scope of the manufacturer's marketing scheme. In unfair competition cases, everything that is likely to have an impact upon the purchaser

---

15. Defendant's Exhibit 178.

16. Deere's manager of factory marketing for the plant that manufactures Deere loaders.

17. 15 U.S.C. § 1125(a) provides:
    Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

is relevant to the ultimate determination of whether the purchaser may be confused as to the origin of the product, McCarthy, *Trademarks and Unfair Competition,* Sec. 2:2 (1973).

This action involves essentially three elements of Farmhand's marketing programs: Its use of color, the overall configuration of its goods, and its advertising program. The plaintiff alleges that it is the *combination* of the above elements that constitutes a violation of 15 U.S.C. 1125(a).[18]

■ Both plaintiff and defendant rely heavily on the case of *Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210 (8th Cir.1976), in which the Eighth Circuit gave protection under Section 43 of the Lanham Act to a unique semitrailer-truck configuration. Under the *Fruehauf* case, plaintiff has the burden of establishing that:

1. The elements that plaintiff seeks to protect are nonfunctional;

2. That the elements have acquired a secondary meaning, and

3. That defendant's use of these elements is likely to cause confusion in the minds of the consuming public.

*Functionality*

Even a summary of the law defining the various components of this concept would be voluminous. Therefore, the Court discusses only the most basic elements of the doctrine as it relates to the matter now before the Court.

■ The *Fruehauf* decision defines functionality in terms of whether protection against imitation of the feature will hinder the competitor in competition:

If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellish-

ment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without limitation, the law grants protection.

*Fruehauf,* at pp. 1217–18. Thus, *Fruehauf* makes it clear that the features to be protected must have been adopted for the purposes of identification and individuality in order to be considered nonfunctional. In *Fruehauf,* the trapazoidal shape of the "Cornhusker 800" semitrailer truck was not based on sound engineering principles but was chosen for the purposes of identification. The nonfunctionality of the design was confirmed by a Fruehauf report that stated that the only function of the trapazoidal design was to "gather road dirt and mud." *Fruehauf,* at p. 1218.

■ The configuration of the loaders in this case was based on sound engineering principles. This distinguishes the *Fruehauf* decision from this case. The loader mast, mounting frame, torque tube positioning, bucket top, cylinder positioning and hydraulic line routing were all chosen by Deere based on the utilitarian functionality of these features. The styling suggestions of the Dreyfuss firm were adopted because they made the loader more aesthetically pleasing to the farmer. The Court concludes that all of these features are functional as that term is used in the *Fruehauf* decision. (*See also Vibrant Sales, Inc. v. Newbody Boutique,* 652 F.2d 299, 304 (2d Cir.1981), "None of the features mentioned could properly be classified as 'a mere arbitrary embellishment ... adopted for purposes of identification and individuality .... They are therefore beyond the scope of the protection which Section 43(a) affords.")

18. The Court is careful to consider this action in that light. However, in determining the strength of plaintiff's chain, the individual links must be examined; *Black and Decker Mfg. v. Ever-Ready Appliance,* 518 F.Supp. 607 (E.D. Mo.1981).

*Fruehauf* made it clear that some items that perform a utilitarian function can be protected under 15 U.S.C. 1125(a). Some designs adopted for the purpose of identification are not wholly useless, but perform some utilitarian function. Still, it deserves protection where the shape or feature is in its concept arbitrary. *Fruehauf,* at p. 1218. The functionality issue in *Fruehauf* was summarized as follows:

> The evidence is consistent with the conclusion that the sloping end walls of the Cornhusker 800, arbitrarily designed for the purpose of identification, were no more than *merely incidentally functional.* The prohibition against the copying of them will not affect Fruehauf's competitive position in the marketplace.

(Emphasis supplied; similar language can be found in *Dallas Cowboy Cheerleaders v. Pussycat Cinema,* 604 F.2d 200, 203 (2d Cir. 1979)).

Plaintiff contends that some of its loader features are "merely incidentally functional" and thus, are eligible under *Fruehauf* for protection. It also maintains that since the function of these features could be performed by features of a different shape, Farmhand should be required to adopt one of these alternatives.

The Court interprets the "merely incidentally functional" language differently than does the plaintiff. The Court believes that this language was simply intended to direct attention away from the inquiry as to whether a product is "functional" in the utilitarian sense of the word. The semi-trailer truck in *Fruehauf* has *some* function. It held grain. The wine decanter in *Application of Mogen David Wine Corp.,* 328 F.2d 925 (C.C.P.A.1964), had some function—it held wine. The ashtray in *Haeger Potteries, Inc. v. Gilner,* 123 F.Supp. 261 (D.Cal. 1954), had some function—it held ashes. Yet, in each of these cases, the courts protected the arbitrary design from use by others. It seems that no configuration of

goods case would ever be won by a plaintiff if the word "functional" was so strictly and literally applied.

Even under the plaintiff's reading of *Fruehauf,* the Court would have to reject the relief that plaintiff seeks. The features that the plaintiff has identified as contributing to the unique overall appearance of the loader were not arbitrarily chosen for the purpose of identifying the loader. The decision to incorporate them in the loaders was based on sound engineering principles.

The Court does not agree that the availability of alternative designs aids plaintiff in its quest for protection. In *Keene Corp. v. Paraflex Industries, Inc.,* 653 F.2d 822 (3d Cir.1981), the Third Circuit responded to a similar contention by stating: "Merely because there are other shapes and designs which defendants could use and still produce a workable product, the design used is thereby not nonfunctional," *Keene, supra,* at p. 827 (*citing Application of Honeywell,* 532 F.2d 180 (C.C.P.A. 1976).

Whether the color John Deere green alone is capable of protection under 15 U.S.C. 1125(a) presents an interesting question.[19] Plaintiff maintains that the color serves no function and thus, meets the first requirement under the *Fruehauf* decision. Defendant contends that color is aesthetically functional because farmers prefer to match the color of their loader to that of their tractor.

With respect to the question of color, the Court again looks to McCarthy for the general rule. According to this treatise, "color, per se, is not capable of appropriation as a trademark. That is, one seller cannot feature a certain color in its packaging and claim that 'This is my color. No one else in the trade can use this color.' But color may be an essential element in an arbitrary arrangement of symbols and words." McCar-

**19.** The Court, if it has not already done so, wishes to make it clear that Deere is not trying to appropriate protection for all shades of green. It seeks to protect only the particular shade of green that has become known as John Deere green. In doing so, it also requests protection for close imitations of the color. Deere has requested an injunction barring Farmhand from using John Deere green or other "confusingly similar" shades of green.

thy, *Trademarks and Unfair Competition,* Sec. 7:16 (1973). One reason for the general rule that denies a manufacturer's appropriation of a particular color is that there are only a limited number of colors and shades of colors available. Another reason given by McCarthy is that infringement actions would soon denigrate into questions of shade confusion.[20]

Plaintiff relies on a number of cases to support its proposition that the color John Deere green is entitled to protection under the Lanham Act. These cases can be grouped into two categories. First, there are a number of cases that have protected the use of a particular array of colors in a unique design. Second, there are cases wherein drug manufacturers have received protection for the use of a particular color on their capsules.

The cases of *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema,* 604 F.2d 200 (2d Cir.1979), and *Chevron Chemical Co. v. Voluntary Purchasing Groups,* 659 F.2d 695 (5th Cir.1981), are typical of the first category noted above. In *Dallas Cowboy Cheerleaders,* the Second Circuit gave protection to the unique color configuration used in the cheerleaders' uniforms, i.e., white boots, white shorts, blue blouses, and white star-studded vest and belt. The Court specifically stated that "color alone is not capable of becoming a trademark," but held that the cheerleading uniform was an arbitrary design which makes the otherwise functional uniform trademarkable. *Dallas Cowboy Cheerleaders, supra,* at p. 203.

The *Chevron* case involved the trade dress on its "Ortho" brand products. The label is composed of three horizontal bands of color. The top band, covering 20% of the label is white, the second band, covering 30% of the label, is yellow, and the bottom

band, covering 50% of the label, is red. The bottle itself is dark brown with a yellow cap. The Fifth Circuit held that the packaging of the lawn chemical was a distinct and arbitrary design and that the competitors imitation of the design was likely to cause confusion among consumers. The Court protected the design, but specifically stated: "Ortho could not preempt the use of red and yellow, nor does it seek to do so." *Chevron, supra,* at p. 703.

The "pill cases" cited by plaintiff are certainly the closest that the courts have ever come to dividing up the color spectrum among manufacturers. The most noteworthy of the pill cases is *Darby Drug v. Ives Laboratory,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Unfortunately, after two trips to the Second Circuit Court of Appeals and review by the Supreme Court, it is still uncertain as to whether the blue color can be protected under Section 43(a) of the Lanham Act.

*Darby Drug* was tried under §§ 32 and 43(a) of the Lanham Act. The Court of Appeals held that plaintiff had shown a violation of § 32 and therefore did not reach the § 43(a) claims. The action under § 32 was reversed for failure to give the appropriate deference to the trial court's findings of fact. The action under § 43(a) was remanded to the Second Circuit Court of Appeals. Section 32 of the Lanham Act was not pleaded in the matter now before the Court and has little relevance to the issues presented here.[21]

■ Farmhand argued that, even if color were capable of protection under Section 43(a), the doctrine of "aesthetic functionality" bars the relief sought by Deere. The doctrine of aesthetic functionality defines functionality in terms of consumer acceptance. The doctrine apparently began with

---

**20.** At the final argument in this case, the Court held an interesting discussion regarding the practical difficulty of enjoining the use of John Deere green. *See* transcript of proceedings held January 28, 1982, at pp. 36–46. The practical problems identified in this discussion lend credence to the "shade confusion" rationale for denying protection of color under the Lanham Act.

**21.** It is interesting to note that the District Court in *Darby Drug* has found that the blue color was functional to patients, doctors and hospitals. An annotation of other cases wherein color was found functional can be found in McCarthy, *Trademarks and Unfair Competition,* § 7:21 (1973).

98

*Pagliero v. Wallace China*, 198 F.2d 339, 343 (9th Cir.1952), wherein the Court stated:

> If the feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or a copyright.

More recently, in *Keene v. Paraflex Industries, Inc.*, 653 F.2d 822 (3d Cir.1981), the Court of Appeals held that under the doctrine of aesthetic functionality, the inquiry should focus on the extent to which the design feature is related to the utilitarian function of the product or feature.

The *Keene* case involved the imitation of a commercial lighting unit called the "Wall Cube." This lighting device was designed for placement on apartment buildings and other commercial structures. Paraflex Industries copied the design of the lighting fixture, but the Third Circuit refused to enjoin Paraflex's sale of the product since it was aesthetically functional. The lower court in *Keene* had held that architectural compatibility between the lighting fixture and the design of the building on which it is to be placed is often a significant criteria of selection. Based on this finding, the Court of Appeals held that the design configuration was not an arbitrary expression of aesthetics, but was intricately related to its function of architectural compatibility.[22]

■ The Court concludes that the doctrine of aesthetic functionality should apply to the dispute now before the Court. The Court has found that farmers prefer to match their loaders to their tractor just as the lighting fixture in *Keene* was designed to match the architecture of the building on which it was mounted.[23]

*Fruehauf* holds that the determinative question on the issue of functionality is whether protection against imitation will hinder the competitor in competition, *Fruehauf, supra*, at 1218. The Court has found that protection of John Deere green and the features that are common to both products would hinder Farmhand in competition. Defendant's Exhibits 175 and 178 are very strong evidence that Deere in fact believes that this is true.

■ Functional features in products are available for copying in our society unless they are covered by patents. The difficulty in a case such as this is in distinguishing personal notions of what is "fair" from the societal objectives in the law of unfair competition. It is not only fair to imitate non-patented functional products,[24] it is necessary to our form of economy.

*Secondary Meaning*[25]

■ The doctrine of secondary meaning is the law's recognition of the psychological effect of trade symbols upon the buyer's mind. The prime element of secondary meaning is a mental association in the buyer's minds between the alleged mark and a single source of the product. McCarthy, *Trademarks and Unfair Competition*, § 15:2 (1973); *Fruehauf, supra; Processed Plastics Co. v. Warner Communications*, 675 F.2d 852 (7th Cir.1982).

---

**22.** The lower court in *Keene* had ordered Paraflex to label its product "made in Taiwan" and "not a product of Keene Corporation." This remedy was to prevent the palming-off of the Wall Cube, a situation not present in the matter now before the Court.

**23.** The Court held a discussion during closing argument about the lower court's order in *Keene* that required the defendant to label its product "made in Taiwan—not a product of Keene Corporation." This remedy redressed the palming-off that occurred in *Keene*. The Court refuses to impose a similar sanction here because this is not a palming-off case and because Farmhand labels its product adequately.

**24.** *See Keene, supra:* "Our natural inclination to disapprove of such conduct [copying] must give way to the public policy favoring competition, *even by slavish copying*, of products not entitled to federal patent protection. *See also Darby Drug, supra*, Justice White concurring; *In re Water Gremlin Corp.*, 635 F.2d 841, 844 (C.C.P.A.1980); *Fisher Stoves v. All Nighter Stove Works*, 626 F.2d 193 (1st Cir.1980).

**25.** Given the Court's disposition of the functionality question, this portion of the opinion is not necessary. Any secondary meaning associated with functional features is, of course, irrelevant since no functional feature may be given protection under 15 U.S.C. § 1125(a).

Plaintiff's primary proof of this element was the Doane survey, described above. Whereas the survey possesses the qualities necessary to find it reliable,[26] it suffers from limitations placed upon it by its designers.

The first portion of the survey showed the survey panel the front cover of the Farmhand brochure (plaintiff's Exhibit 29) in which a Farmhand loader is mounted on a Deere tractor. The question asked was whether the panel member thought that Farmhand was marketing the loader alone or in conjunction with another company. Approximately half of the panel members thought that Farmhand was marketing the loader in conjunction with another company. The other company cited in over 90% of these responses was John Deere.

Had the panel members been shown the entire brochure, the Court may have considered enjoining the use of this brochure.[27] However, this portion of the survey is not particularly probative on the issue of secondary meaning. To establish a secondary meaning for the configuration of the loader, the panel should have seen a Deere loader without the Deere decals and green paint and been asked if they identified that loader with a single source.[28]

The Deere engineers testified at great length as to those features that they believe give the Deere loader a unique overall appearance. This testimony, while relevant, was not entitled to great weight on the issue of secondary meaning. It is, of course, the consumer's association that is determinative of secondary meaning. The Deere engineers can easily identify the similarities and differences among the various loaders on the market. Both parties agreed, however, that the mere fact that a product is identifiable or distinguishable does not give it secondary meaning.

The Court concludes that plaintiff has failed to meet its burden of proving secondary meaning with respect to the configuration of the loader. This theory of the case is quite similar to that presented in *Fruehauf*. However, the nature of the unique configuration here is somewhat elusive. The Court's difficulty in identifying the nature of what is sought to be protected would undoubtedly be carried to the industry.

In the second phase of the survey, the panel was asked to name the manufacturer they associated with the particular shade of green. When shown the John Deere green chip, farmers overwhelmingly associated the shade with Deere. The consumers were not asked, however, if they identified the color only with Deere. *Fruehauf, supra,* at Page 1220, requires that the design be associated with a *single* source. In light of the fact that there are a number of manufacturers using John Deere green, the response to this question, as modified, could have been significant. On this basis, the Court is unwilling to find that plaintiff has established a secondary meaning for the color John Deere green.

### Likelihood of Confusion

The final element of a cause of action under § 43(a) is the likelihood of confusion in the minds of the buying public.

**26.** The Court concludes that the survey evidence was conducted in such a manner as to find it is reliable and thus, admissible. *See Squirtco v. 7-Up Co.,* 628 F.2d 1086 (8th Cir. 1980) (Technical deficiencies go to the weight of the evidence, not to its admissibility.) The Court has also examined the factors for consideration set forth in the *Handbook of Recommended Procedures for the Trial of Protracted Litigation,* 25 F.R.D. 351 (1960). Under these guidelines, the Court concludes that the survey is not perfect, but is nevertheless admissible.

**27.** It is clear that Farmhand's aggressive sales strategy has involved the use of questionable brochures, i.e., ones that display the John Deere name more prominently than the Farmhand name. Although Farmhand has canceled the circulation of plaintiff's Exhibit 29, voluntary cessation of wrongful activity does not moot a request for injunction.

**28.** The Court does not suggest that this is the only way to prove secondary meaning. Several valid ways are suggested in McCarthy, §§ 15:10 *et seq.* However, the most probative way is through a survey. In this case, the non-survey evidence is insufficient to establish secondary meaning.

*Fruehauf, supra.* Having reviewed the evidence on this point, the Court concludes that it must be resolved in favor of the defendant.

Plaintiff's primary evidence in this regard was the first phase of the Doane survey, described above at page 92. The Court, having set forth its conclusions with respect to the survey, will not comment further on its strengths or weaknesses. Additionally, plaintiff requests that the Court infer a likelihood of confusion from the evidence of intentional copying.

This evidence must be balanced against the following evidence suggesting that there is not a likelihood of confusion. First, Deere attempted to locate instances of customer confusion (defendant's Exhibit 55) and now acknowledges that it was unsuccessful in this attempt.[29] Second, Farmhand is well known in its trade area and conspicuously labels its product. Third, the nature of the loader purchase[30] suggests that farmers go to considerable lengths to know exactly what it is they are buying. It can be inferred from this decision-making process that farmers would also become well aware of the *origin* of the product. Finally, Farmhand's use of a black bucket also serves to distinguish the two loaders.[31]

Probably the best evidence on this issue is circumstantial evidence. Almost all Farmhand F–248 and F–258 loaders are sold through Deere dealers. There was considerable evidence at trial to the effect that Deere dealers were honest and outstanding business persons. Mr. Harrington of Deere testified that he would find it difficult to believe that a Deere dealer would create confusion as to the origin of a Farmhand loader.[32]

After balancing the evidence on this point, the Court concludes the plaintiff has not met its burden of proving that there is a likelihood of confusion between the Deere loader and the Farmhand loader.

### Defense of Estoppel or Laches

Defendant argues that Deere is barred by estoppel or laches from bringing this action because other manufacturers have been using the color John Deere green for years without being sued by Deere. Most of these other uses of John Deere green are inconsequential or were unknown to Deere. Deere has protested other uses of the color John Deere green with varying degrees of success. The Court concludes that although this action must fail, it does not fail based on laches or estoppel, *see Eastman Kodak v. Fotomat Corp.,* 317 F.Supp. 304 (N.D.Ga. 1970).

### Antitrust Counterclaim

The Court concludes that defendant has failed to prove a violation of the antitrust laws.[33] As stated in *United States v. Grinnell Corp.,* 384 U.S. 563, 86

---

**29.** One would think that an effort such as this would turn up some evidence of confusion if it actually existed.

**30.** *See* page 92 of this Order.

**31.** Farmhand contends that the color of the bucket was changed after the commencement of this action due to its desire for uniformity among its lines rather than as a response to the suit. The Court reviews this matter cognizant of Farmhand's intention to keep the loader bucket painted black. The Court therefore does not express an opinion at this time as to whether a green bucket would alter its opinion on the issue of likelihood of confusion.

**32.** The evidence at trial made it abundantly clear that this is not a palming-off case.

**33.** 15 U.S.C. § 1 provides:
Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several states, ... is hereby declared to be illegal ....

15 U.S.C. § 2 provides:
Every person who shall monopolize, or attempt to monopolize ... any part of the trade or commerce among the several states, shall be deemed guilty of a felony ....

15 U.S.C. § 14 provides:
It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for the sale of goods, ... on the condition, agreement or understanding that the ... purchaser thereof shall not use or deal in the goods ... of a competitor ... where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any *line* of commerce.

S.Ct. 1698, 16 L.Ed.2d 778 (1966), the offense of monopoly has two elements—one, the possession of monopoly power in the relevant market, and two, the willful acquisition or maintenance of that power. The Court concludes that the defendant has failed to prove either element.

The Court does not believe that this action was motivated by an attempt to acquire or maintain a monopoly on loaders that are custom fit for Deere tractors. It is sometimes a fine line that distinguishes the zealous advocacy demanded from lawyers from the unethical or even illegal activity. However, the Court believes that the actions taken on behalf of Deere fall into the category of zealous advocacy.

Count III of the counterclaim requests a declaration to the effect that a judgment for plaintiff would violate the antitrust laws. The Court has some difficulty with the reasoning behind such a declaration. First, the Court would not participate in a scheme to monopolize an industry. Second, if this Court were to find for the plaintiff, it would be on the ground that it had sustained its burden under the unfair competition laws. Assuming the decision were sustained on appeal, it would be truly peculiar to have a violation of the antitrust laws. The Court is not aware of any inconsistency between the Lanham Act and the Clayton or Sherman Acts. The relief sought under Count III of the counterclaim will therefore be denied.

IT IS HEREBY ORDERED that the Clerk of Court shall enter judgment in favor of the defendant with respect to the allegations of plaintiff's Complaint. The Court hereby denies plaintiff's request for an injunction and damages.

IT IS FURTHER ORDERED that the judgment shall contain a declaration as follows: The color John Deere green and the configuration of the John Deere 148 and 158 loaders are functional as that term is used in § 43 of the Lanham Act, 15 U.S.C. § 1125(a). Deere has not established that a secondary meaning exists for the color John Deere green or the configuration of its loader as that phrase is interpreted under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Deere has failed to establish that there is a likelihood of confusion between the Deere 148 and 158 loaders and the Farmhand F–248 and F–258 loaders as that phrase is interpreted under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of the plaintiff with respect to the allegations contained in Count II of defendant's counterclaim.

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of the plaintiff with respect to the allegations contained in Count III of the defendant's counterclaim.

IT IS FURTHER ORDERED that defendant's request for attorney fees is hereby denied.