648 F.Supp. 704 (1986)
CONTOUR CHAIR LOUNGE CO., INC., Plaintiff,
v.
TRUE-FIT CHAIR, INC. and Arthur C. Ferro, Defendants.
No. 85-145C(6).
United States District Court, E.D. Missouri, E.D.
October 14, 1986.
*705 *706 *707 Joel S. Goldhammer, Philadelphia, Pa., Stuart N. Senniger/Michael E. Godar, St. Louis, Mo., for plaintiff.
Daniel K. Barklage, St. Charles, Mo., F. Douglas O'Leary, St. Louis, Mo., for defendants.

MEMORANDUM OPINION
GUNN, District Judge.
This matter is before the Court for a decision on the merits. Plaintiff brought this action under the Patent Act, 35 U.S.C. § 281, alleging patent infringement; under the Lanham Trade-Mark Act, 15 U.S.C. §§ 1114 and 1125(a), alleging trademark infringement and unfair competition, including trade dress infringement and passing off; and under state common law for unfair competition, breach of a covenant not to compete, and misappropriation of trade secrets. Defendants by counterclaim allege unfair competition and violations of federal and state antitrust laws.
Jurisdiction of this Court is predicated on 28 U.S.C. § 1338(a) and principles of pendent jurisdiction.
The case was tried before the Court sitting without a jury. After consideration of the pleadings, the testimony and exhibits produced at trial, the stipulations of the parties, and the parties' briefs and post-trial material, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52, Fed.R.Civ.P.

FINDINGS OF FACT
Plaintiff Contour Chair Lounge Co., Inc. (Contour) is a corporation organized and existing under the laws of the State of Missouri, having a principal place of business in that state.
Defendant True-Fit Chair, Inc. (True-Fit) is a corporation organized and existing under the laws of the State of Missouri, having a principal place of business in that state. Defendant Arthur C. Ferro (Ferro) is an individual residing in St. Louis, Missouri. Ferro owns approximately ninety percent of True-Fit's stock.
Counterclaim defendant Craftmatic/Contour Organization, Inc. (Craftmatic) is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, having a principal place of business in that state. Contour is a wholly owned subsidiary of Craftmatic.
Contour was incorporated in 1947 by Joseph F. Laskowitz, who with Joseph Hoskiss created the first Contour Lounge Chair about that time. Ferro, an upholsterer and furniture designer and manufacturer, joined Contour in 1961 as factory manager. Contour's principal product at the time became the Contour Lounge Chair after other lines were discontinued. In 1962 Ferro became the general manager of Contour in charge of sales and manufacturing, and in 1963 he became executive vice president.
By written agreement effective April 1, 1965, Ferro and Contour entered into an employment contract. Paragraph One provided that Ferro was to be employed by Contour as its Executive Vice President and General Manager for a period of five years. Renewal was automatic on an annual basis thereafter, unless written notice was given within ninety days of the termination date.
Paragraph Two defined Ferro's job duties which included, but were not limited to, the general operation and management of the production of Contour products, and developing, improving, and creating new features of the Contour Lounge Chair.
In Paragraph Five Ferro assigned to Contour all design and utility patents which issued to Ferro while employed with Contour. Ferro was to be paid a royalty of one dollar ($1.00) per unit for the use of all patents used by Contour, with a maximum of $5,000 per year or the aggregate of *708 $50,000. The royalty was payable in the event Contour discharged Ferro.
Paragraph Seven contained a covenant not to compete. Ferro agreed that in the event of the termination of his relationship with Contour, he would not participate in any business involving the sale or manufacture of any product similar to or competitive with Contour's products. Certain enumerated furniture products were excepted: conventional living room furniture; chairs convertible from a sitting to a reclining position; bedroom suites; and kitchen, dinette or dining room furniture. The covenant not to compete extended to the continental United States and was effective for five years from the date of Ferro's termination.
Ferro manufactured a Contour Lounge Chair in 1963, for which he was awarded U.S. Patent No. 3,232,575 (Ferro-1) on February 1, 1966. In 1976, Ferro manufactured a second Contour Lounge Chair for which the patent-in-suit, U.S. Patent No. 4,101,168 (Ferro-2) issued on July 18, 1978. Both of these utility patents, which will be described in detail below, were assigned to Contour in accordance with the parties' agreement. Additionally, design patents, now expired, issued to Ferro, as well as to other Contour employees, over the years with Contour as the assignee. Some of these designs replicate the chair depicted in figures included in the utility patents' specifications as embodiments of the patented devices. These design patents were issued by the Patent Office both prior to and after the issuance of the Ferro-1 utility patent. Most expired prior to the issuance of the Ferro-2 utility patent.
Ferro became president of Contour in 1967. He then owned approximately 25% of the shares of Contour stock. Prior to and during Ferro's presidency of Contour, the Contour Lounge Chair was sold through independent dealers and distributors. Stanley Kraftsow, now president of Craftmatic/Contour, became related with Contour in the 1960s. Kraftsow ran a retail store in Philadelphia, Pennsylvania, starting around 1966. With the knowledge of direct sales methods he had acquired from Contour's California dealers, Kraftsow expanded his territory.
Kraftsow accomplished this increase in his business by using advertising inserts in newspapers which included a business reply card. A customer would fill in and return the card to the dealer who would send more literature to the prospective customer and follow up with a telephone call to secure an appointment. A salesman would then meet the prospective client at the prospect's home. An in-home demonstration followed, using a pitch book, swatch book, brochure, audio-visual or perhaps a demonstrator model of a Contour Lounge Chair. Through this method, Kraftsow's business expanded to neighboring states. By 1974, Kraftsow's sales had increased 300% from 1971 sales.
Upon making a sale, an independent dealer, like Kraftsow, placed his order with the Contour factory and included a down payment. Contour would then manufacture a custom-fitted chair whose seating section conformed to the customer's body measurements and would ship the product to the customer. The customer paid the dealer for the chair; the dealer retained his share and remitted the remainder of the wholesale price to Contour.
As his business grew, Kraftsow began to have trouble obtaining timely deliveries from the factory. His telephone calls to Ferro went unanswered. Starting in 1972, Kraftsow began to express an interest in purchasing a part of Contour. Follow-up purchase negotiations occurred in 1975 and 1976. Kraftsow wanted any type of arrangement with Contour as he bore the brunt of Contour's advertising expenses. Moreover, he desired to secure timely deliveries.
In 1976 Contour cancelled Kraftsow as a dealer in all territories except Philadelphia, and in 1977 Kraftsow quit Contour as a dealer. Sales of the Contour Lounge Chair fell drastically with Kraftsow's departure.
In August 1978 Contour was purchased by another corporation, SBI, Inc. (SBI), through a stock acquisition. At the time of *709 the purchase, John Wilmsen, the president of SBI, considered that Contour was not a going concern. During purchase negotiations between Contour shareholders and SBI in 1977 to 1978, Ferro signed a statement that he owed Contour $18,457.06 for salary advances. This amount appeared as an asset on Contour's books.
Prior to the purchase of Contour, Wilmsen read Contour's financial statements. Besides the asset of $18,457.06, a footnote to the statements listed a contingent liability of royalty payments. Thus, Wilmsen knew about this contingent liability, but he was not aware of Ferro's 1965 employment contract which was the source of the liability. The employment contract was never mentioned by Wilmsen or Ferro. After the acquisition of Contour, Wilmsen and Ferro often spoke about the need for an employment contract. Wilmsen told Ferro it was not his policy to have employment contracts with his employees, and an employment contract was never entered into between Ferro and SBI. Ferro testified that he believed his 1965 employment contract was abandoned by Wilmsen.
Under SBI, Ferro answered to Wilmsen. Although Ferro may have continued to carry the title of president of Contour, his duties were restricted to running the factory. He was not permitted to make any expenditures over the amount of $5,000 without first consulting SBI's controller or executive committee. Ferro's shares of Contour stock were converted to SBI shares.
Contour's financial condition went from bad to worse as sales continued to decline. On January 6, 1982, Wilmsen fired Ferro. From that date until June 1983 no royalties were paid to Ferro, nor did SBI or Wilmsen request that Ferro pay SBI the $18,457.06.
In May 1983 Ferro, interested in selling his shares of SBI back to Wilmsen or SBI, asked to meet to negotiate a sale. Wilmsen mailed Ferro a letter offering $29,547.87 for his 481 shares of stock. Included with the letter was a receipt and a release which made reference to patents and royalties. Puzzled over what the release referred to, Ferro consulted his attorney. The attorney wrote an exception to the release which stated: "Except amount due to undersigned for royalties due under employment contract with Contour Chair Lounge Company."
On June 10, 1983, Ferro brought with him his employment contract, his letter from Wilmsen with the receipt and release, and the written exception. This was the first time Wilmsen or SBI became aware of the existence of the 1965 contract. To counter Ferro's demand of royalty payments due him under the 1965 contract, SBI demanded Ferro pay his $18,457.06 debt. Ferro refused, and the purchase negotiations fell through. Ferro then attempted to purchase Contour from SBI, but this deal also fell through.
In the meantime, SBI had retained Kraftsow as its national sales manager. On September 29, 1983, Kraftsow bought the Contour factory from SBI through his own corporation, Craftmatic Contour Industries, Inc. On this same date Ferro's $18,457.06 debt was written off Contour's books.
Under Kraftsow's control of Contour, the company produces advertising as well as the Contour Lounge Chair with independent dealers buying both. The dealers also pay for all additional advertising expenses, as Kraftsow had done while he was a dealer. Kraftsow's marketing methods again proved successful and sales went from 4,103 chairs in 1983 to 18,192 chairs for the first ten months of 1985. Approximately 50% of these sales were for the "Cimberly" model of the Contour Lounge Chair. This is Contour's basic model and is featured on all of Contour's advertisements. Contour's other models offer variations on the "Cimberly," such as a base without legs or a skirt around the base. Every model has available a massage unit and a heat unit as optional features.
The Contour Lounge Chair is unlike adjustable lounge chairs which take their occupant from an upright seated position to a reclining position. Rather, a Contour Lounge Chair's occupant is always in a reclining position. The chair is comprised *710 of a rigid, contoured seating section which moves in a curved path along a base section thereby enabling the user to position his or her legs above the heart level. The movement is accomplished by an electric motor.
Each Contour Lounge Chair sold since 1947 has the same unique shape and styling forming a distinctive and recognizable visual appearance. This particular overall appearance of the chair is not necessary to its function. A variety of other chair designs functioning in the same manner as the Contour chair, but without its distinctive configuration, are available to manufacturers seeking to compete with Contour.
Millions of dollars have been spent by Contour and its dealers since 1947 in promoting and advertising its chair. Virtually without exception, every Contour advertisement through the years pictured the chair, particularly its distinctive side profile. This visual approach to advertising has succeeded in associating Contour in the public's mind as the producer of its chair. The exterior appearance of the Contour chair was dissimilar from any other lounge chair on the market  until the True-Fit chair was produced.
After Ferro left Contour in January 1982, he worked for other companies designing and selling furniture. Ferro incorporated True-Fit Chair, Inc. in August or September 1982, and in July 1984 he started to create a lounge chair which he had been planning for about one year. Rejecting various chair designs, Ferro's True-Fit Chair was patterned after the "Cimberly" Contour Lounge Chair. True-Fit went into production of the chair in September 1984.
Ferro obtained parts from various sources including some which he had used when he was with Contour. One of these parts suppliers, Car-Anth, had manufactured specially made parts for Contour. Car-Anth was left with over-stocked inventory of these parts, and when told by Kraftsow that he did not care what was done with them, Car-Anth offered the parts to Ferro who purchased them for use in the manufacture of the True-Fit chair.
The True-Fit chair and the "Cimberly" Contour chair even when compared side-by-side look identical.[1] The differences between the two chairs pointed to by defendants, such as the slightly tapered legs and the slight pitch of the armrest of the True-Fit chair, are insignificant and imperceptible. This indistinguishability was intended by Ferro.
Upon completion of the True-Fit chair, defendants enlisted five dealers to sell it, four of whom were former Contour dealers, and the fifth an associate of a former Contour dealer. On numerous occasions True-Fit dealers used Contour promotional literature, letterheads and/or order forms with customers and on seven specific occasions passed off True-Fit chairs to customers inquiring about and assuming that they were being provided with a Contour chair. The products which defendants put into these dealers' hands clearly allowed for this deception of purchasers. Defendants' chair carried no clearly visible label identifying its manufacturer as True-Fit. The evidence further established that if defendants did not actually intend such substitution of goods, they knew or should have reasonably anticipated that True-Fit dealers were engaging in such practice.
Defendants have sold 616 True-Fit Chairs as of November 13, 1985. Contour's normal weekly production at the factory is 550 to 600 chairs; it has a capacity to manufacture approximately 1,000 units per week. Contour's retail price for its chair is approximately $2,000, earning a net profit for Contour of $194 per chair. A True-Fit chair costs approximately $1,200 retail. In addition to the current litigation, plaintiff has brought suit against four of True-Fit's dealers based upon their practices in connection with the sale of the True-Fit chair.

*711 The Registered Trademark and Patent-in-Suit

U.S. Trademark Reg. No. 1,195,215, issued to Contour on May 11, 1982, is for a chair profile design. It shows, from a side view, two features of the Contour chair: a contoured shaped top section with a curved bottom resting on a reciprocally curved base unit. See Appendix B. Contour uses its trademark on its serial tag number but includes a silhouette of a man reclining in the top portion. See Appendix B.
The patent-in-suit, U.S. Patent No. 4,101,168 (Ferro-2), a utility patent, was issued to Contour, as Ferro's assignee, on July 18, 1978. The patent is entitled "Adjustable Chair" and contains two claims which include the following essential elements:
(1) a fixed top unit for sitting;
(2) a base section;
(3) movement of the curved fixed top along the curved base section;
(4) the use of tracks to accomplish this movement;
(5) roller bearings to aid this movement;
(6) a screw drive mechanism to accomplish the curved movement;
(7) an electric direct drive motor to power the screw drive mechanism;
(8) pivoted mounting of the screw and motor mechanism, one end to the base section and the other to the top unit;
(9) noninterference between the drive mechanism and the cross braces which support the seat of the top unit and which support the frame of the base section; and
(10) a drive mechanism which has to be wholly below the upper limits of the base section.
The particular problem with which Ferro was involved when he invented Ferro-2 was the motorized arcuate movement of a rigid seat section upon a stationary base. Prior art relating to powered positionable chairs and beds would be reasonably pertinent to this problem.
Three prior art references were cited to the Patent Examiner in the application for Ferro-2: Williams, et al., U.S. Patent No. 2,921,621 entitled "Vertically & Horizontally Adjusted Seat Frame"; Black, U.S. Patent No. 3,174,161 entitled "Hospital Bed"; and Ferro, U.S. Patent No. 3,232,575 entitled "Powered Mechanism for Positionable Chairs" (Ferro-1).
Williams has seven claims for an adjustable automobile seat. It teaches the use of a motor driven device in a seat supporting mechanism to move a car seat along the track of a base in a horizontal (back-and-forth) direction, with the capability to raise, lower, or tilt the seat. Vertical, horizontal, and tilting adjustments can be made simultaneously. Horizontal movement is accomplished by a drive mechanism using screw drive and both single and double pivoting. A torsion bar is rotated to raise or lower the seat through a link to the screw drive mechanism. Tilting appears an inherent characteristic of the torsion bar rotation upon which the design capitalizes.
Black has seven claims. It teaches the use of springs, cables, electric gear-operated motors, and screw drives to position the mattress of a hospital bed.
Ferro-1 had four claims. The adjustable lounge chair which was the subject of this patent had a top portion for sitting which moves along a curved path on a base section by means of rollers on tracks. An electric motor turns a belt; this pulley system in turn drives a threaded shaft. One part of the shaft assembly is connected to the base section of the chair. The threaded shaft goes through a U-joint at this connection, extending towards the base or head portion of the chair. The other end of the drive unit is connected to the top portion of the chair at the pulley. As the drive unit extends or contracts, the shaft and drive mechanism pivots at the U-joint.
The patent-in-suit claims disclose four advantages over Ferro-1:
(1) a positioning advantage whereby there is no interference between the screw drive mechanism and the braces located in the upper and bottom sections, which are used for support;
*712 (2) the top section moves relative to the bottom section without coming off its rails and eliminating any possibility of misalignment of the pulleys and drive belts by the movement of the top on the bottom;
(3) the easy means of disconnecting the motor mechanism by pulling out the two pivot pins located at opposite ends of the drive mechanism in order to remove it to replace or repair; and
(4) the positioning of the motor and screw mechanism so it does not intrude into the seat area.
The Patent Examiner twice rejected the application for the patent-in-suit based on his examination of prior art and aware of the first and third above advantages over Ferro-1. After amendments to the patent application and argument by plaintiff's patent attorney stressing the other two advantages, the patent-in-suit issued.
Four patents not considered by the Patent Examiner are Hansen, U.S. Patent No. 3,212,747 issued in 1965; Zur, U.S. Patent No. 3,934,927 issued on January 27, 1976; Rigby, U.S. Patent No. 2,784,764; and Wise, U.S. Patent No. 2,966,069.
Hansen, an automotive seat which moves horizontally and vertically, teaches the advantages in the use of the direct drive motor operation of a screw drive mechanism. Its motor's compact size also teaches the pivoting at both ends of the drive mechanism, the motor end and the screw drive end, unlike a pulley mechanism. All parts where the pivoting occurs are adequately supported so that when the motor is stopped the seat retains its position, which is critical for an automotive seat.
Zur teaches the use of an electric motor operating a screw drive which is pivotally mounted at both ends in a powered tilting lounge chair. Zur contains eight claims for a chair comprising a top seat section mounted to a base by a pivot hinge whereby the power mechanism tilts the chair from an upright position to the desired angle. The drive mechanism is attached at one end to the base and at the other end to the seat by pivot connections. Thus, the seat section travels, tracing out a kind of an arc-shaped path, not upon a base by means of rollers, but upon its base by means of a single pivot hinge. Cross braces in Zur do not move with respect to each other as they do when the patent-in-suit's top moves on its base.
Rigby teaches the use of a screw drive unit, with an electric motor to power the unit and the drive mechanism pivoting at both ends of the screw drive, to move an adjustable seat support as a single unit.
Wise teaches the use of a motor driven screw drive mechanism for fore and aft adjustment of an automobile seat.
Defendants failed to establish that plaintiff thought or had any knowledge that the patent-in-suit was invalid.

CONCLUSIONS OF LAW

PLAINTIFF'S CLAIMS

I. Unfair Competition

A. Trade dress infringement

Plaintiff claims that defendants have violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Missouri common law, by adopting a trade dress which is confusingly similar to plaintiff's. Plaintiff argues that the unique configuration and total image of the Contour chair is nonfunctional and has acquired secondary meaning.[2]
Title 15 U.S.C. § 1125(a) provides as follows:
Any person who shall ... use in connection with any goods ... or any container for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods ... to enter into commerce, ... *713 shall be liable to [sic] a civil action by any ... person who believes that he is or is likely to be damaged by the use of any such false description or representation.
"The key to finding a violation under section 43(a) is a determination that the materials used by the defendant created a likelihood of confusion, deception or mistake on the part of the consuming public." Toro Co. v. R & R Products Co., 787 F.2d 1208, 1214 (8th Cir.1986).[3]
Section 43(a) can be used to protect the "trade dress" of a product from confusingly similar imitations. The trade dress of a product "involves the total image of a product and may include features such as size, shape, color, ... texture, ... or even particular sales techniques." Prufrock, Ltd. v. Lasater, 781 F.2d 129, 132 (8th Cir.1986) (Prufrock). See also Petersen Manufacturing Co. v. Central Purchasing, Inc., 740 F.2d 1541, 1550 (Fed.Cir. 1984) (applying 9th Cir. law) (overall product shape may be protected if it meets criteria of functionality and secondary meaning); Truck Equipment Service Co. v. Fruehauf Corp., 536 F.2d 1210 (8th Cir.) (TESCO), cert. denied, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976) (exterior design of hopper bottomed grain semi-trailer constituted product's protected trade dress). The Court first concludes that the unique appearance of the Contour chair constitutes a trade dress.
There are three prerequisites to trade dress protection: the trade dress must be nonfunctional; it must have acquired a secondary meaning; and its imitation must create confusion in consumers' minds as to the origin of the imitating product. Id.; Black & Decker Manufacturing Co. v. Ever-Ready Appliance Manufacturing Co., 684 F.2d 546, 550 (8th Cir. 1982) (Black & Decker).
A trade dress is nonfunctional if it is an arbitrary embellishment primarily adopted for purposes of identification and individuality and hence unrelated to basic consumer demands in connection with the product so that prohibition against its imitation will not hinder honest competition. If, however, the trade dress is an important ingredient in the commercial success of the product, it is functional and prohibition of its imitation would substantially hinder competition by others. Thus, the interests of free competition permits imitation of functional trade dress features in the absence of a patent or copyright, but nonfunctional features may be protected from imitation if the other two prerequisites are met. Prufrock, 781 F.2d at 133; TESCO, 536 F.2d at 1217-18.
"The line between functionality and non-functionality is not brightly drawn in every case. Some designs adopted for the purpose of identification are not wholly useless. In such a case protection would not be lost merely because the shape or feature also serves a useful purpose." TESCO, 536 F.2d at 1218.[4]
The second prerequisite for trade dress protection under the Lanham Act, secondary meaning, has been explained as follows:
[A] name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods ... may become so associated in the public mind with such goods ... that it serves to identify them and distinguish them from the goods ... of others. When such an association exists, the name, mark, or symbol is said to have acquired a "secondary meaning." ...
Id. at 1219. The essence of secondary meaning is the association in the mind of the public of particular aspects of trade dress with a particular product and producer. Black & Decker, 684 F.2d at 550.
*714 The third and, as stated above, basic prerequisite is purchasers' likelihood of confusion as to the source of the imitating product. Actual confusion is not essential to a finding of infringement; however, a mere possibility is not enough. "There must be a substantial likelihood that the public will be confused." WSM, Inc. v. Hilton, 724 F.2d 1320, 1329 (8th Cir.1984); See also Vitek Systems, Inc. v. Abbott Laboratories, 675 F.2d 190, 192 (8th Cir. 1982). Although evidence of actual confusion is not necessary to finding of likelihood of confusion in a § 43(a) claim, it is nevertheless the best evidence of likelihood of confusion. Toro Co. v. R & R Products Co., 787 F.2d 1208, 1215-16 (8th Cir.1986).
Based upon this Court's findings that the configuration and total image of the Contour Lounge Chair are nonfunctional and have acquired a secondary meaning and that defendants' imitation thereof creates a strong likelihood of confusion in consumers' minds as to the origin of defendants' product, as evidenced by numerous cases of actual confusion,[5] the Court concludes that defendants have engaged in unfair competition in violation of § 43(a) of the Lanham Act by imitation of the trade dress of the Contour chair.
Missouri common law of unfair competition follows the general principles of unfair competition expressed in the Lanham Act. Bass Buster, Inc. v. Gapen Manufacturing Co., 420 F.Supp. 144 (W.D. Mo.1976). Accordingly, what has been said in disposing of plaintiff's § 43(a) claim applies equally to its common law unfair competition claim for trade dress infringement.

B. Passing off

Liability under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under Missouri law of unfair uncompetition, will attach to a manufacturer who puts goods into the hands of dealers for sale to the public which contain the means for deceiving the public and which the manufacturer can reasonably anticipate will be so used. Stewart Paint Manufacturing Co. v. United Hardware Distributing Co., 253 F.2d 568, 575 (8th Cir.1958); A.H. Robins Co. v. Medicine Chest Corp., 206 U.S.P.Q. 1015, 1019 (E.D.Mo.1980); Biocraft Laboratories, Inc. v. Merck & Co., 532 F.Supp. 1068 (D.C.N.J.1980). The Court concludes that under the facts of the present case as found by this Court, defendants' supplying the True-Fit chair to its dealers establishes defendants' violation of § 43(a) of the Lanham Act and the common law for the resulting passing off which occurred.

II. Registered Trademark Infringement

Plaintiff claims, under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), that defendants have infringed its federal trademark Reg. No. 1,195,214, by manufacturing a chair which embodies the shape shown on the trademark and by using a side view photograph of their chair in their advertising. The Court concludes that this claim is without merit.
Title 15 U.S.C. § 1114(1)(a) makes it unlawful to:
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.
*715 Plaintiff's registered trademark is a symbolic logo depicting in outline form a stylized profile of its product. The scope and nature of this trademark does not encompass an actual three-dimensional chair or a photograph thereof. Accordingly, the above statutory provision does not apply to the claimed infringing acts in this case. These acts are properly the subject of plaintiff's unfair competition claims under 15 U.S.C. § 1125(a), and the common law.

III. Patent Infringement

Plaintiff claims that defendants have infringed its patent, U.S. Patent No. 4,101,168, in violation of the Patent Act, 35 U.S.C. § 281.
Defendants admit to infringing the patent-in-suit, but claim that the patent-in-suit is invalid due to its obviousness in light of prior art.

A. Assignor estoppel

Plaintiff argues that defendant Ferro as assignor of the patent-in-suit, and defendant True-Fit, as a party in privity with Ferro, are estopped from challenging the validity of the patent.
The doctrine of assignor estoppel which provides that "an assignor of a patent right is estopped to attack the utility, novelty or validity of a patented invention which he has assigned or granted as against anyone claiming the right under his assignment or grant," Westinghouse Electric & Manufacturing Co. v. Formica Insulation Co., 266 U.S. 342, 349, 45 S.Ct. 117, 119, 69 L.Ed. 316 (1924), no longer states the prevailing rule of law. See Scott Paper Co. v. Marcalus Manufacturing Co., 326 U.S. 249, 257-58, 66 S.Ct. 101, 105, 90 L.Ed. 47 (1945) (assignor may defend infringement suit on the ground that the claims of the assigned patent were based on a prior patent that had expired); Interconnect Planning Corp. v. Feil, 543 F.Supp. 610, 613 (S.D.N.Y.1982). Accordingly, the Court rejects plaintiff's argument that defendants are estopped from asserting that the infringed patent is invalid for obviousness.

B. Presumption of validity

Title 35 U.S.C. § 282 provides:
A patent shall be presumed valid.... The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.
Under this provision, the party asserting invalidity has both the procedural burden of first establishing a prima facie case, and the burden of persuasion on the merits which remains with that party until final decision. Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 291 (Fed.Cir.1985) (Ashland), cert. denied, ___ U.S. ___, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1985); Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1534 (Fed.Cir.1983). With all the evidence in, the trial court must determine whether the party upon which § 282 imposes the burden of persuasion has carried that burden. Id.

C. Obviousness

35 U.S.C. § 103 (1982) provides as follows:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.
The ultimate conclusion of obviousness is a legal conclusion based on factual findings. The trial judge's function in such a case was described by the Federal Circuit Court of Appeals in a recent case, Polaroid v. Eastman Kodak Co., 789 F.2d 1556, 1558 (Fed.Cir.1986):
That the question [of obviousness] is "legal" does not mean that "to a judge" may be substituted for the statutory phrase "to one of ordinary skill in the art". Thus the obvious/nonobvious question is not answerable by a judge on the sole basis of what he or she thinks "ought" to be patentable under § 103. *716 The trial judge, eschewing all personal predilections, must decide on the totality of the evidence whether the accused infringer has carried its § 282 burden of proving by clear and convincing evidence facts requiring a conclusion that one of ordinary skill would have found the claimed invention obvious at the time it was made.
The factual inquiries in a case challenging the validity of a patent are set forth in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), as follows:
Under § 103 the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.
Each fact forming the factual foundation upon which the Court bases its ultimate conclusion regarding the obviousness of the claimed subject matter as a whole must be established by clear and convincing evidence. Ashland, 776 F.2d at 292.
Introduction of prior art not considered by the examiner can help the validity challenger carry its burdens described above, but it does not "weaken" or otherwise affect the statutory presumption of validity; Lindemann Maschinenfabrik v. American Hoist & Derrick Co., 730 F.2d 1452, 1459 (Fed.Cir.1984); Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d at 1534.
In the present case, the Court concludes that defendants have not carried the burden of persuasion on the question of Ferro-2's invalidity because of obviousness.
The "scope of the prior art" has been defined as that "reasonably pertinent to the particular problem with which the inventor was involved." Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d at 1535. As stated above in the Court's Findings of Fact, the scope of the prior art in the present suit is powered positionable chairs having a rigid seat section move on a base.
The content of the prior art includes the cited patents as well as Hanson and Zur, the most relevant prior art being Ferro-1. Defendants have not persuaded this Court that the advantages of Ferro-2 over the prior art were not significant or that the ways of achieving these advantages were obvious to one of ordinary skill in the art of mechanized adjustable furniture. Because defendants have stipulated to infringing the Ferro-2 patent and have not succeeded in their challenge to this patent's validity, plaintiff is entitled to judgment on its claim under 35 U.S.C. § 281.

IV. Misappropriation of Trade Secrets

Plaintiff's claim under Missouri common law for misappropriation of trade secrets is based on defendants' buying of parts from sources, especially Car-Anth, which Ferro had used when he worked for Contour, and on defendants' enlisting as dealers former Contour dealers who had knowledge of and access to Contour customers.
Under Missouri law, to prevail in an action for trade secret misappropriation, a plaintiff must prove the existence of a trade secret, plaintiff's maintenance of secrecy, and defendant's unlawful acquisition and use of the secret. Carboline Co. v. Jarboe, 454 S.W.2d 540, 549 (Mo.1970). Missouri courts have adopted § 575 of the Restatement of Torts to define the term "trade secret," as follows:
[A]ny ... compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. [A trade secret] may be ... a list of customers.... The subject matter of a trade secret must be secret. Matters of public knowledge in an industry cannot be appropriated by one as his secret.... [A] substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information.... Some factors to be considered *717 in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 18-19 (Mo.1966) (en banc); see also Sigma Chemical Co. v. Harris, 605 F.Supp. 1253, 1261 (E.D.Mo.1985), aff'd in part, rev. in part on other grounds, 794 F.2d 371 (8th Cir.1986); Metal Lubricants Co. v. Engineered Lubricants Co., 284 F.Supp. 483, 488 (E.D.Mo.1968), aff'd, 411 F.2d 426 (8th Cir.1969); Walter E. Zemitzsch, Inc. v. Harrison, 712 S.W.2d 418, 421 (Mo.Ct.App.1986).
An analysis of the evidence in this case in light of these factors leads the Court to conclude that plaintiff has not proven that the identity of its parts suppliers, its former dealers or its customers were trade secrets. Most significantly, there was no evidence of any measures taken by plaintiff to prevent disclosure internally or externally of any of the relevant information. Thus, though this information may have been of value to Ferro, it cannot form the basis of an action for misappropriation.

V. Breach of Covenant-not-to-Compete

Plaintiff claims that defendant Ferro breached the covenant-not-to-compete contained in the 1965 employment contract. Ferro argues that the contract was abandoned by the parties and no longer valid after the purchase of Contour by SBI in 1978.
Under Missouri law, a written contract may be rescinded or abandoned by the implied agreement of the parties as shown by the parties' acts and declarations which are inconsistent with the continued existence of the contract. Tahan v. Garrick, Inc., 701 S.W.2d 189, 191 (Mo.Ct.App.1985); Schwartz v. Shelby Construction Co., 338 S.W.2d 781, 787-88 (Mo.1960). Where acts and conduct are relied on to constitute abandonment, such acts must be "positive, unequivocal and inconsistent with intent to be further bound [by the contract]." Julian v. Kiefer, 382 S.W.2d 723, 729 (Mo.Ct. App.1964).
The evidence in the present case established that the 1965 employment contract between Ferro and Contour was subsequently abandoned by the parties. The facts that Wilmsen had no knowledge of the 1965 contract, and that both he and Ferro understood that their relationship was not subject to that contract's terms as evidenced by their discussions on the subject of employment contracts and Wilmsen's statement that he disfavored such contracts, by the limitations placed on Ferro's duties after Wilmsen acquired Contour, and by the failure of Contour to pay and Ferro to demand royalty payments upon his termination, lead to the conclusion that the 1965 agreement was abandoned long before Ferro left Contour and began to compete. Ferro's attempt in 1983 to collect patent royalties does not negate this conclusion nor preclude Ferro from showing in this litigation, as he has done, that the 1965 agreement was abandoned. A party cannot breach a contract which has been abandoned. Accordingly, plaintiff's breach of contract claim must fail.

DEFENDANTS' COUNTERCLAIMS

I. Antitrust and Unfair Competition

Defendants claim that plaintiff has violated § 2 of the Sherman Act, 15 U.S.C. § 2, by instituting the present action and the actions against True-Fit dealers. The Court concludes that this claim is totally without merit.
Antitrust liability based on enforcement of a patent presupposes patent invalidity and requires proof that the patentee had actual knowledge of such invalidity prior to the enforcement. E.I. Dupont *718 De Nemours v. Berkley & Co., 620 F.2d 1247, 1273 (8th Cir.1980); Darda, Inc., USA v. Majorette Toys (U.S.), Inc., 627 F.Supp. 1121, 1140 (S.D.Fla.1986); see also Handguards, Inc. v. Ethicon, Inc., 601 F.2d 986 (9th Cir.1979) (a patentee's infringement suit is presumptively in good faith), cert. denied, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980).
As stated above, this Court concludes that the patent-in-suit was valid. To be cautious, the Court reaches the conclusion, assuming patent invalidity, that defendants failed to present any evidence nor could it be inferred from any evidence, that plaintiff believed or had any reason to believe that the patent-in-suit was invalid. Furthermore, defendants failed to establish the other requisites of a § 2 claim including the relevant product market and the possession by plaintiff of sufficient power in that market to present a dangerous probability of monopolization.
Defendants also claim that plaintiff engaged in unfair competition by making false statements to prospective True-Fit customers disparaging defendants and their product. The Court concludes that there was a lack of sufficient credible evidence to support this claim.

REMEDIES

I. Patent Infringement

Pursuant to 35 U.S.C. § 283, this Court concludes that plaintiff is entitled to an injunction against further infringement by defendants of the patent-in-suit.
In addition to injunctive relief, 35 U.S.C. § 284 provides that:
[u]pon a finding for the claimant [in a patent infringement suit] the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer together with interest and costs as fixed by the court....
[T]he court may increase the damages up to three times the amount ... assessed.
The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.
In Aro Manufacturing Co. v. Convertible Top Replacement Co., 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964), the Supreme Court stated: "The question to be asked in determining [patent] damages is `how much had the Patent Holder ... suffered by the infringement.' And that question is primarily: had the Infringer not infringed, what would Patent Holder ... have made." The methodology of assessing and computing damages under 35 U.S.C. § 284 is within the sound discretion of the trial court. TWM Manufacturing Co. v. Dura Corp., 789 F.2d 895, 898 (Fed.Cir.1986).
Plaintiff claims as damages the profits on sales he would have made absent the infringement, which plaintiff claims are the sales defendants made. To obtain such damages a plaintiff must prove:
(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.
Radio Steel & Manufacturing Co. v. MTD Product, Inc., 788 F.2d 1554, 1555 (Fed.Cir. 1986).
The Court concludes that plaintiff sufficiently proved these elements only as to the seven True-Fit chairs which were passed off as Contour chairs. Based upon plaintiff's evidence that its net profit per chair is $194.00, plaintiff is entitled to $1,358.00 as lost profits damages plus interest from September 1, 1984, the date infringement began. See id., at 1558.
In addition, plaintiff is entitled to a reasonable royalty for the sales for which actual damages, i.e., lost profits, were not proven. The determination of a reasonable royalty is based on the royalty to which a willing licensor and a willing licensee would have agreed at the time the infringement began. Radio Steel, at 1557. No expert *719 testimony was offered on what a reasonable royalty in this case would be.
Based on the evidence presented, the Court concludes that a reasonable royalty for use of the patent-in-suit is $1.00 per unit. This was the amount plaintiff was willing to pay Ferro for use of the patent-in-suit and there was no evidence that this amount was not reasonable or that another amount would be more reasonable. Plaintiff is accordingly awarded an additional $609.00 plus interest from September 1, 1984, based upon defendants' sales through November 13, 1985. Upon request, plaintiff may obtain an accounting from defendants as to additional True-Fit chairs sold thereafter for each of which plaintiff will be entitled to recover $1.00 plus interest from September 1, 1984.

II. Unfair Competition

The Eighth Circuit has held that § 35 of the Lanham Act, 15 U.S.C. § 1117,[6] is the appropriate and exclusive provision for determining the monetary relief to be awarded for violations of § 43(a) of the Act, 15 U.S.C. § 1125(a). See Metric & Multistandard Components v. Metric's, Inc., 635 F.2d 710, 715 (8th Cir.1980). Section 35 grants the district court "broad discretion to award the monetary relief necessary to serve the interests of justice, provided it does not award such relief as a penalty." Id.
Plaintiff has proven that defendants' acts of trade dress infringement will continue to cause confusion among consumers unless enjoined. Plaintiff is therefore entitled to an injunction. See Bass Buster, Inc. v. Gapen Manufacturing Co., 420 F.Supp. at 161. The scope of such injunctive relief is limited to the geographic area of plaintiff's actual market penetration. Id.; TESCO, 536 F.2d at 1221-22 (trade dress rights are not acquired by advertising alone; they are acquired by the use of the trade dress in connection with the sale of the product). Accordingly, injunctive relief will be granted to cover all states in which plaintiff has made at least one sale. Defendants have not contended that the scope of injunctive relief, if appropriate, should be more limited.
Plaintiff is also entitled to lost profits for the seven instances wherein actual consumer confusion was proven; however, plaintiff has already recovered these damages under its patent claim. The Court concludes that other actual damages claimed for defendants' acts of unfair competition are too speculative.
Finally, the Court concludes that the above relief will satisfy the equities of plaintiff's unfair competition claims.

*720 EXHIBIT B

ORDER
Pursuant to the Memorandum Opinion filed herein this day,
IT IS HEREBY ORDERED that JUDGMENT be and is entered for plaintiff on its claim under the Patent Act, 35 U.S.C. *721 § 281, in the amount of $1,967.00 plus interest from September 1, 1984.
IT IS FURTHER ORDERED that defendants and their agents be and are RESTRAINED and ENJOINED from continuing to infringe U.S. Patent No. 4,101,168.
IT IS FURTHER ORDERED that JUDGMENT be and is entered for plaintiff on its claims under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under Missouri common law of unfair competition.
IT IS FURTHER ORDERED that defendants and their agents be and are RESTRAINED and ENJOINED from selling the True-Fit chair as it now exists or any other chair that so resembles plaintiff's chair so as to create a confusion among the purchasing public as to origin. This injunction extends to all states in which plaintiff has made at least one sale of its chair.
IT IS FURTHER ORDERED that JUDGMENT be and is entered for defendants on plaintiff's claim for breach of contract.
IT IS FURTHER ORDERED that JUDGMENT be and is entered for defendants on plaintiff's claim for misappropriation of trade secrets.
IT IS FURTHER ORDERED that JUDGMENT be and is entered for plaintiff on defendants' counterclaims.
IT IS FURTHER ORDERED that defendants shall pay the costs of this litigation.
NOTES
[1] During the trial of this case, a "Cimberly" Contour chair and a True-Fit chair were on display in the courtroom as exhibits.
[2] For a cogent discussion of the relationship between a utility patent infringement claim and a § 43(a) Lanham Act claim based on a trade dress that replicates the device depicted in support of the utility patent see Cable Elec. Prod., Inc. v. Genmark, Inc., 770 F.2d 1015, 1030-31 (Fed.Cir.1985).
[3] In the non-patent matters of this case, this Court is guided by the relevant law of the Eighth Circuit. See Atari, Inc. v. JS & A Group, Inc., 747 F.2d 1422, 1435 (Fed.Cir.1984) (en banc).
[4] For a comprehensive definition of functionality and discussion of factors which may aid in a determination thereof, see In re Morton-Norwich Products, Inc., 671 F.2d 1332, 1338-43 (C.C. P.A.1982).
[5] These three prerequisites to trade dress protection are fingings of fact. Prufrock, Ltd. v. Lasater, 781 F.2d 129, 132-33 (8th Cir.1986).
[6] Section 35 of the Lanham Act, 15 U.S.C. § 1117 provides as follows:

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.